THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SAMMIE GARRETT, Defendant-Appellant.

(Nos. 55230, 58465;

First District (2nd Division)—February 25, 1975.

James J. Doherty, Public Defender, of Chicago (Dale W. Broeder, Vincent M. Gaughan, and Matthew J. Beemsterboer, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Thomas D. Rafter, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

After a bench trial Sammie Garrett (hereinafter defendant) was found guilty of the murder of Karen Thompson by shooting her with a shotgun and for the unlawful use of a weapon.[1] After denying defendant's motion for a new trial, the court imposed a sentence of 20 to 40 years on the murder charge and a concurrent sentence of 1 to 5 years on the unlawful use of weapons charge.

Thereafter, the defendant filed a direct appeal (No. 55230) urging that the defendant was not proven guilty of the offense of murder beyond a reasonable doubt and that he was denied a fair trial. On May 11, 1972, over 24 months after sentencing and while the direct appeal was pending, a post-conviction petition[2] was filed on behalf of the defendant, asserting that during the trial of the case he was denied his constitutional rights of effective assistance of counsel and confrontation. The State filed a motion to dismiss, and after oral argument and the court's consideration of said pleadings, on October 31, 1972, the trial court granted the State's motion to dismiss. Thereupon defendant appealed the dismissal of the post-conviction petition (No. 58465). This court allowed the consolidation of the two appeals.[3] To help understand the separate theories, we shall summarize the facts presented in each appeal.

*No. 55230*

At the bench trial of the murder and unlawful use of weapons charges, the defendant was represented at all times by privately retained counsel. The State called 13 witnesses and presented the testimony of one witness by stipulation. At the conclusion of the State's case, defendant made a

---

[1] The unlawful use of weapons conviction involving the possession of a shotgun with a barrel less than 18 inches in length (Ill. Rev. Stat. 1969, ch. 38, par. 24—1 (a)(7) is not raised in this appeal.

[2] See Ill. Rev. Stat. 1971, ch. 38, par. 122—1 *et seq.*

[3] After this court entered its order allowing the consolidation of the two cases, the briefs thereupon filed by the parties mixed the facts and arguments of the two cases to such a degree that this court ordered each party to file new briefs so that the facts and legal arguments could be considered in a proper fashion.

motion for a directed verdict on both charges which, after extensive arguments, the court denied. Thereupon defendant rested without calling one witness. After closing arguments, the court found the defendant guilty of murder and the unlawful use of weapons. The evidence before the trial court presented the following story.

Karen Thompson, the deceased, a white girl, was married. In the fall of 1969 her husband was a teacher at a south suburban high school. They had two children. At the time of the instant incident, the younger sister of the deceased lived with the Thompsons.

From August, 1969, through the date of her death on November 9, 1969, Karen was a student at Prairie State College, enrolled in a course on Afro-American Art and Culture. The class met on Wednesday evenings and usually Karen would leave home for class around 6:30 in the evening and usually return at 10 or 10:30 P.M. On the Wednesday preceding her death she had not returned home by midnight, whereupon her husband left home to look for her. While he was gone Karen returned home around 12:30 A.M., and, according to her sister, Karen was crying and upset. About 1 A.M. Thursday, her husband returned home and engaged Karen, who appeared to be distraught, in a conversation as to where she had been. Karen admitted she was having an affair with another man. Karen's husband testified that between Wednesday evening and prior to November 9, she had mentioned suicide, that periodically she appeared to be mentally depressed, and that he had suggested psychiatric help.

On November 8, 1969, the following Saturday, Karen, by telephone, discussed transportation arrangements for an evening get-together with friends Karen and her husband were to meet that night. Upon concluding the telephone conversation, Karen turned to her husband and said, "I can't face those people, I don't know."

Around 4 P.M. on Saturday, November 8, Karen packed a suitcase, borrowed $40 from her sister and was picked up at her house by a taxicab. The cab driver identified a photograph of Karen as the person she transported to 211 East 16th Street in Chicago Heights (a south suburban Cook County community). After exiting from the cab, according to the driver, Karen met a Negro man who resembled the defendant. The cab driver testified she worked until 4:30 P.M. on that Saturday and Karen was her last passenger of the day.

About 8:30 P.M., November 8, a Mr. and Mrs. James West of Los Angeles, California, registered for Room 5 at the Ford City Motel located at State Street and Route 30 in southern Cook County, near Chicago Heights.

During the late evening hours of November 8, the owner of Kazak's lounge in Chicago Heights saw the defendant and a white girl enter

the lounge. The defendant had a package wrapped in a coat and the owner, believing the object looked like the barrel of a shotgun, told the defendant he would have to get out with the shotgun. After a brief conversation, the defendant left and returned in about 4 or 5 minutes, during which time the white girl remained at the table. The owner left in about 10 minutes; at that time, defendant and the girl were still there. The owner testified that he heard no gunshots or loud noises that resembled gunshots while the defendant was at Kazak's; that the girl appeared to have been under the influence of alcohol.

About 12 midnight on November 8, Ed Savage, a 2-year acquaintance of the defendant, arrived at Kazak's lounge, and, upon seeing the defendant and deceased sitting at a table, he joined them. The three drank beer while the defendant waited for two chicken dinners. Between 12:30 and 1 A.M. Savage drove the couple to the Ford City Motel at Route 30 and State. Before getting into the car, the defendant got his gun, which looked like a sawed-off shotgun wrapped in a green jacket, in the alley behind Kazak's. The defendant told Savage he found the gun. Savage testified he did not hear any shots at the time the defendant obtained the gun.

During the morning of Sunday, November 9, the defendant, his two brothers, and two females walked into headquarters of the First District, Chicago Police Department.[4] Defendant then volunteered the information to an assistant desk sergeant that he had been sleeping in a motel the previous evening; that when he got up Sunday morning he noticed a white girl named Karen lying at the side of the bed and that she looked like she was dead; that he identified the Ford City Motel Room 5 as where he slept; that he then left the room and proceeded to his brother's house, and thereupon came to the Chicago Police Department headquarters. The desk sergeant, by telephone, immediately notified the Cook County sheriff who had jurisdiction of the unincorporated area of Cook County where the motel was located.

About 10:50 A.M. on Sunday, November 9, 1969, Detective William Mitchell of the Cook County Sheriff's Police met the defendant at the First District Police Station and, after advising the defendant of his rights, the defendant accompanied him in Mitchell's car and drove to the Ford City Motel at Route 30 and State Street. During the ride the defendant said that he was out with the deceased; that they were drinking and smoking "pot" while at the Ford City Motel; that he fell asleep, and

---

[4] Although not in the record, the court can take official notice that the address of the Chicago Police Department, First District headquarters is 1121 South State Street, which is at least 25 miles from Chicago Heights, Illinois.

when he awoke the deceased was lying in a pool of blood; that he then dressed, picked up a shotgun lying alongside the body, wrapped it in his coat and left; and that he did not hear any shotgun blast.

Regarding his acquisition of the shotgun, Mitchell testified that the defendant said he had found the shotgun in an alley to the rear of a "chicken eating place" at 319 15th Street at approximately 2:25 A.M. while in the company of the deceased and one Edward Savage, and that he had fired two shots at that same location. Mitchell further stated that the defendant told him he had hidden the gun under the porch of his aunt's home; that the defendant directed him to the home where under the porch they found a "sawed-off, single barrel .12-gauge shotgun" wrapped in a green coat containing one spent shell; and that they then proceeded to the alley behind the "chicken house" where the defendant claimed he had found the gun and had fired two shots, and there the witness found one empty .12-gauge shotgun shell which he later gave to an Officer Borowski.

Mitchell went on to state that, at the police station on the date of the conversation, he had noticed a small cut between the defendant's thumb and index finger.

About 10:49 A.M. on Sunday, November 9, 1969, Patrolman Richard K. Larson of the Cook County Sheriff's Police Department, pursuant to radio direction, proceeded to the Ford City Motel Room 5. Upon arriving at Room 5 and opening the door, he found it was partially blocked by an object; that he looked inside and observed a female body lying on the floor; and that he observed a wound in the head and the body was not moving. Thereupon he secured the room and called for the detective unit.

Upon the arrival of the detectives, in order to re-enter the room, the door was squeezed because it would not open all the way as the body obstructed the operation of the door. The head of the body was toward the door; the body was on its back with the head and shoulders blocking the door. The officers testified that the body had a large wound in the head over the upper right eye with quite a bit of blood and brain matter around the body, floor, door and walls.

Inside, the officers testified, they found a bed in the middle of the room which had bed clothing in disarray, a desk, a chair and a suitcase by the door. Also found in the room were empty bottles and beer cans, a container with a grass-like substance appearing to be marijuana, one pair of man's shorts, a woman's brassiere, purse and coat, a .12-gauge shotgun shell that was not fired, and a note found on the dressing table which read:

"I killed myself, Karen."

It was stipulated by the parties that the note was in the handwriting of the deceased.

The police witnesses testified that in Room 5 when discovered, the body was clothed in a sweater and slacks; the body was examined for powder burns around the head wound and forehead but none were found; and no abrasions, cuts, discolorations or bruises were found about the hands. The police removed the body to the county morgue.

Delivered to the Chicago crime lab were two spent shotgun shells, one found in the alley behind Kazak's and one found in the chamber of the weapon, the live .12-gauge shell, various pellets recovered from the floor, and the shotgun which had a 15-inch barrel. The expended shotgun casing found in the shotgun and the one found in the alley behind the "chicken house" were compared with two test-shot empty shells by a Chicago Police Department firearms identification examiner and determined to have been fired from the .12-gauge shotgun obtained by Detective Mitchell under the rear porch of defendant's aunt's home.

The .12-gauge shotgun was described as a sawed-off single-barrel 15 inches long, containing, at the time found, a black tape at the middle of the barrel taping it to the stock and also a piece of black tape behind the trigger. Detective Mitchell testified he observed the gun test-fired about six times in a clamp on both sides of the barrel and the trigger pulled by a rope placed through the trigger, and that each time the gun was fired it landed on the floor. Mitchell further testified that, if he were holding the gun toward himself, the gun would go the opposite way from the direction of the shell or bullet after a discharge; that if the deceased was in a prone position already on the floor and fired the shotgun, the weapon owing to recoil, could possibly fall right next to the body; and that if in the recoil the gun hit some other object, it could have bounced to any position.

Detective Robert F. Borowski, a sheriff's policeman who testified as an evidence technician about the condition of the body and the scene in Room 5, stated that in his opinion, the force exerted against the victim was in a downward direction since "there was no tissue matter at all on the ceiling. It all started from the middle of the wall down to the floor." Borowski further testified that he had fired weapons thousands of times and a weapon similar to the subject shotgun approximately 20 times, and it was his opinion a person firing such a gun while holding it is a reverse position toward himself would not be able to hold onto the weapon and would also injure his thumb and forefinger.

Detective Borowski then testified that, while in the presence of himself and Detective Mitchell, Officer Sadunas of the Chicago Police Department Crime Laboratory fired various shotgun patterns from the subject

gun; that, when the gun was fired anywhere from one to two feet from the target, it left a powder burn on the target but, when fired at a distance of four feet from the target, there were no powder burns; that upon firing, the weapon recoiled to the rear and slightly upward; that he recovered expended pellets from the floor in the area around the body and found none embedded in the walls or ceiling; that, assuming the victim was lying flat on the floor and shot the gun with it pointed toward her forehead, it is the witness' opinion that there would have been pellets embedded in the floor; that he found no pellets so embedded in the floor; that if the witness fired such a gun he would hold it at his waist to absorb the recoil; that, in his opinion, one could hold the gun in this position and inflict the wound that killed the deceased only if she were in a kneeling position; that the body was lying perfectly straight when found with only the arm bent; and that, in the witness' opinion, if the person firing the shot held the weapon above his waist, he would have suffered greater injuries from the gun's recoil than if he had fired it from his waist.

John M. Sadunas, a scientific crime detection laboratory firearms identification examiner for the Chicago Police Department, testified that his duties are to receive, record, evaluate and render a report of his findings on firearms and firearms evidence. He further stated that in his opinion, holding the gun in reverse fashion pointed slightly downward would cause hand injury due to the gun's recoil; that he has never fired such a gun in a reverse manner because he did not believe he could retain it in his hand as it would jump out of his hand; that the subject gun has a loose stock which forces it down with the opening lever more exposed, which is one of the reasons you get bit or cut by it, and that when he test-fired the gun he wore gloves; and that he had fired similar weapons without gloves and did not sustain an injury.

Sadunas then testified that powder burns depend upon the gram equivalent, and that the test shots had the same powder content as did the two expended cartridges according to factory specifications.

Sadunas and witness Borowski each identified 11 exhibits, photographs of shot patterns consisting of blotting and mat paper, each containing a hole of different size and degree of color around the periphery of the hole. The exhibits were identified as shot patterns from the subject gun fired toward the exhibit at a distance of 1 inch to 4 feet, with each exhibit indicating different degrees of dark areas identified as gun powder burns. The exhibits illustrated that the dark area or gun powder burns were more noticeable on the exhibits used at the 1-inch to 10-inch distances, whereas when the distance was 12 inches to 4 feet the amount of powder burn or dark area was either much lighter or not noticeable. Or to state

it another way, the darker the area around the hole, the closer the shotgun was to the exhibit.

The parties stipulated that Dr. Fioresse, a physician specializing in the field of toxicology, examined the tongue and palate of the victim and removed from the palate and tongue area 10 to 18 pieces of an unknown substance, one of which he submitted to further chemical examination and determined to be lead.

Edward Shalgos, a physician practicing pathology, testified as a pathologist to the Coroner of Cook County and as the Assistant Director of the Department of Pathology. He testified that he had performed "quite a few thousand" post mortem examinations during his term with the coroner's office; that he had conducted "somewhere in the vicinity of 100" post mortems involving gunshots; and that he examined the body of Karen Thompson which entailed an appraisal of the body externally and then an incisional appraisal of all body cavities with the organ contents. The findings he made revolved only about the head wound of projectile character, more specifically of shotgun character. Shalgos testified that the entire vertex which is the roof aspect of the head extending from the forehead to the absolute back of the head and then from each ear region, right and left, was a component of the shotgun wound; that there was a complete gaping opening; that all of the bones and skin tissue were laid broadly open with an essential absence of the usual skull contents from the usual skull position; and that there was a second hole above the level of and partially involving the right ear. Shalgos further testified that he did not observe any powder burns; that in his opinion the projectory was backward from the front of the body, backward, toward the right, with suggestions of a slightly downward course; that the second hole showed signs of exit force and the gaping hole in the forehead showed signs of entry force; and that directly above and to the rear of the entry wound the skull was widely gaping. In other words, an explosive force opened it broadly. It was fractured; the only trauma or injury about her person was with a reference to the head and related parts. Shalgos testified that in his opinion Karen Thompson's death was caused by a shotgun wound to the head lacerating the brain most profoundly.

The witness further testified that, as part of his regular autopsy routine, he removed the soft palate and tongue from the body so as "to evaluate further the identity of a dusky reddish central patch on the dorsum, the roof aspect in the back of the tongue, and a bluish black area on the right back aspect of the mouth side of the soft palate," but that his subsequent analysis of these samples did not alter his conclusions or findings with regard to the cause of death.

On cross-examination Dr. Shalgos stated that the proximity of the gun

to the victim influences the nature of the injury in that the closer the weapon to the point of impact, the smaller the hole of entry; and that the absence of powder burns was determined by visual observation—he performed no chemical tests for burns. The witness declined to form any opinion regarding whether the victim's wound could have been self-inflicted.

The defendant presented no witnesses and, at the close of the State's case, moved for a directed finding on both charges. The trial court denied the motion.

As stated in its closing argument, the theory of the State's case was that the deceased signed the suicide note, but that the defendant in fact pulled the trigger that fired the fatal shot. The State urged that the evidence established that the weapon used in this case was fired from a distance of 2 to 4 feet as evidenced by the size of the hole in the head and the absence of any powder burns on the deceased, coupled with the fact that on Sunday morning defendant had a small cut between his thumb and index finger; [5] that the deceased could not have pulled the trigger and that there was no hand injury on the deceased; and that the location of the body, the brain material, and defendant's statement that he discovered the gun alongside the victim lying on the floor by the door, together with all the evidence refutes the story given to the police by the defendant.

Defendant's attorney urged that a reasonable doubt is raised by the suicide note; that it was impossible to determine the difference between the bloody matter and a powder burn; that upon awakening and observing the deceased, the defendant became panicky and ran; and that the scratch on the webbing of his hand was from firing the gun the night before.

The court then found the defendant guilty of murder and of unlawful use of weapons and entered judgment on its findings. The defendant's subsequent motion for a new trial was denied, the trial court stating:

"Yes, the Court heard all of the evidence that had been offered and weighed and considered and the Court was then and is now convinced that under all of the facts and all of the circumstances and all of the conditions which were presented by that evidence, it would not have been possible for the deceased to have fired the shot herself."

On April 21, 1970 the trial court imposed sentence.

On appeal the defendant urges that (i) the State failed to prove the defendant guilty of murder beyond a reasonable doubt; and (ii) defen-

---

[5] The record fails to disclose whether this was the right or left hand.

dant was denied a fair trial because (a) of ineffective assistance of trial counsel, and (b) he was denied his constitutional right of confrontation.

## No. 58465

On May 11, 1972, the defendant filed with the trial court a post-conviction petition. The petition was signed by the defendant and contained an affidavit of James J. Doherty, Public Defender of Cook County, who then represented the defendant.[6] The post-conviction petition contained two affidavits, one signed by Doherty, the attorney which contained facts from the record of the earlier trial and facts not theretofore presented to the court, e.g., the alleged conduct of the parties prior to November 8, 1969; alleged facts involving Saturday evening, November 8, 1969, and early the following Sunday morning; an analysis of the theory of the prosecution and actions of defendant's trial counsel in the 1970 murder trial and then allegations concerning Doherty's alleged consultation with John L. Cline, an attorney with an engineering degree, and several pathologists; and copies of correspondence between Doherty and doctors, pathologists, a toxicologist and a gun expert. The affidavit also described an alleged conference betwen Dr. Shalgos, a Dr. Charles S. Petty (county medical examiner at Dallas, Texas), assistant state's attorney Robert Novelle, and Doherty at which time the possible manner of death was discussed.

The second affidavit attached to the petition was by John L. Cline, an attorney-at-law with a B.S. degree in metallurgical engineering, engaged in the practice of patent law. Cline's affidavit alleged he studied and analyzed the trial record, that he read the affidavit of Doherty, and that he concurred in the facts, conclusions and opinions of Doherty's affidavit.

The conclusion of both Doherty and Cline was that the defendant was denied effective assistance of trial counsel and that the matter *dehors* the record irrevocably points to the conclusion that Karen Thompson committed suicide by placing the muzzle of the shotgun in her mouth and pushing the trigger.

Defendant filed on May 23, 1972, a motion for the exhumation and pathological examination of the remains of the deceased.[7]

---

[6] Section 122—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 122—1), which sets forth the statutory procedure for filing post-conviction petitions, provides in pertinent part: "The proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition  *  *  *  verified by affidavit."

[7] The record filed with this court does not indicate the disposition, if any, by the trial court of this motion.

On June 13, 1972, the State filed a motion to dismiss the post-conviction proceeding urging that the post-conviction petition failed to raise any constitutional questions. After extensive oral arguments, the trial court took under advisement the petition and motion to dismiss. Some time later the trial court stated:

"I have reviewed the petition of the defendant and the State's motion to dismiss as well as reviewing carefully the argument of counsel made sometime ago and after so doing it is the belief of this Court that the petition is not sufficiently founded and does not set forth sufficient grounds of [*sic*] basis for the relief sought. And the motion to dismiss is allowed. The petition is denied."

On appeal the defendant raises the following issues:

(1) whether the deceased committed suicide;

(2) whether defendant was denied his constitutional rights of effective assistance of counsel and confrontation; and

(3) whether the trial court erred in denying motions to examine evidence to show that ineffective assistance of counsel affected the outcome of the trial.

### Amicus Curiae Brief

Pursuant to Supreme Court Rule 345 (Ill. Rev. Stat. 1973, ch. 110A, par. 345), this court allowed the South Suburban Bar Association to file an *amicus curiae* brief on behalf of defendant's direct appeal (No. 55230). The *amicus* brief urged that (1) there is no proof that a culpable homicide ever occurred because (a) there is no medico-legal evidence that ruled out suicide; (b) the prosecution failed to overcome the presumption of suicide; (c) the record is fatally devoid of motive proof; and (d) the defendant's actions were not those of a guilty man; and (2) the State's failure to advise its sole medical witness (Dr. Shalgos) of deceased's suicide note until after trial denied the defendant due process of law.

### I.

Both appeals before this court involve two basic issues: (1) did the State prove the defendant guilty of murder beyond a reasonable doubt notwithstanding the suicide note; and (2) was defendant denied a fair trial because of ineffective assistance of trial counsel. For reasons set forth in this opinion we have decided in the direct appeal (No. 55230) to vacate the judgment of conviction on the murder charge and to remand the cause to the trial court pending a resolution of an evidentiary hearing on issues raised in the post-conviction petition, which cause (No. 58465) is being reversed and remanded to the trial court for an evidentiary hearing. Therefore, we shall discuss in this opinion only the reasons

for our action and such matters as may have a bearing on subsequent proceedings before the trial court.

## A.

The basic thrust of the post-conviction petition is that the deceased committed suicide by a contact shot through the mouth. The State stipulated that the note, found when the police arrived in Room 5, "I killed myself, Karen" was in the handwriting of the deceased. Obviously, the State carried a heavy burden in overcoming any presumptions or inferences arising from the said note. Whether or not the deceased committed suicide is a crucial question in determining if the State proved the defendant guilty of murder beyond a reasonable doubt.

As previously noted, the State's theory as to the suicide defense was that the deceased signed the suicide note and then voluntarily allowed the defendant to pull the trigger which conduct by the defendant, despite the victim's consent or solicitation, legally constitutes murder. While there is a stipulation that the note was in the deceased's handwriting, there is no evidence to support the latter portion of the State's theory, which was apparently advanced merely to account for the suicide note. The State strongly urged before the trial court and in this court that the quantity and quality of the circumstantial, expert ballistic and pathological evidence, coupled with evidence which contradicts some of the statements of defendant to Detective Mitchell, established beyond a reasonable doubt that the deceased could not have pulled the trigger; that by defendant's own statements there is no evidence of a possible third person involved in the incident; and that, therefore, the evidence conclusively established beyond a reasonable doubt that the defendant was the person who pulled the trigger. In view of our disposition of this matter, at this time we express no opinion on this issue.

The *amicus* brief urges that the prosecution failed to overcome the presumption of suicide and cites *People v. Ahrling* (1917), 279 Ill. 70, 116 N.E. 764, as authority that the conviction for murder should be reversed. The supreme court reversed the conviction of Ahrling for the murder of his wife and remanded the cause to the trial court. Several counts of the indictment charged the deceased had committed suicide and was induced or procured to do so by the persuasion of Ahrling. Certain evidence pertaining to the deceased's mental condition was permitted to be introduced by the State, but on the other hand, certain other related testimony was not permitted to be placed in evidence by the defendant. Since whether or not the deceased committed suicide was an important fact in determining whether Ahrling was guilty of the crime charged, the supreme court concluded the trial court erred, under the

indictment, in not permitting the defendant to show the mental condition of the deceased.

In *Ahrling* the court noted that the record was barren of any testimony that tended in the slightest degree to show that the defendant had talked with his wife about her committing suicide, or that he had urged her to commit such an act, or that there was any compact between them to commit suicide. The real value of the *Ahrling* case is the holding that, in a case based on circumstantial evidence alone, the evidence of guilt of the accused must be so thoroughly established as to exclude every reasonable hypothesis of innocence; that there must be a reasonable and moral certainty that the accused, and no one else, committed the crime charged; and that in a murder case the *corpus delicti* consists of two elements, *viz.,* the fact of death and the criminal agency of another as the cause of death. The supreme court found that the evidence did not show the criminal agency of Ahrling in connection with the death of his wife.

The indictment and evidence in the instant case clearly distinguish this case from *Ahrling.* However, the principles set out above apply to the issues raised in the instant case. Our research fails to locate any other Illinois case wherein either the evidence( *e.g.,* a note) or a theory (*e.g., Ahrling*) of suicide was involved in a murder conviction.

In *State v. Doyle* (1968), 201 Kan. 469, 441 P.2d 846, a case involving a murder conviction where the deceased was found shot in the front seat of a car with the defendant's gun in his hand, the Supreme Court of Kansas in its opinion discussed at great length the problems of a murder conviction when the evidence suggests suicide.

The court in *Doyle* said:

> "If the evidence is fairly susceptible to the construction that death was accidental, or the result of suicide, or due to natural cause, then it is not sufficient to warrant conviction, for the reason that in order to convict a defendant he must be proven guilty of the crime charged beyond a reasonable doubt. [Citation.] Where the circumstances are as consistent with the absence as well as the presence of crime, the corpus delicti has not been proved since the evidence is susceptible to a construction which will prove innocence as well as guilt. [Citations.]" 201 Kan. 469, 479, 441 P.2d 846, 854.

In the trial of the instant case, the trial strategy of counsel for defendant was that the deceased committed suicide; and that a reasonable doubt was raised by the suicide note. On cross-examination the pathologist witness for the State stated he had no opinion as to whether the wound on the deceased was self-inflicted.

On direct examination Dr. Shalgos, the pathologist, testified he removed the tongue and soft palate of the deceased because he "intended to evaluate further the identity of a dusky reddish central patch on the dorsum, the roof aspect on the right back of the tongue, and a bluish black area on the right back aspect of the mouth side of the soft palate." Dr. Shalgos then stated he was not able to make the original analysis because the samples were transferred to Dr. Fioresse (a toxicologist). Dr. Shalgos was then shown an exhibit, a bottle, containing two of the three samples that were in it; that the third sample, after being returned to him in March, 1970, was cut into small pieces for purposes of preparing microscopic examinations; and that his subsequent analysis did not alter his opinion with regard to the "prejectory [sic]" of the force, the external force exerted upon the deceased, or the cause of death.

In his post-conviction petition defendant presents the theory that the deceased committed suicide by a contact shot through the mouth. In support of this theory, defendant suggests before this court:

A. Dr. Shalgos, the State pathologist, made no inquiry concerning the circumstances surrounding the death; did not know the state of mind of the deceased just prior to death; and did not know of the suicide note until 1 year after the trial, all of which might have had an influence on his conclusions.

B. The only blackening found on the body of the deceased was on her tongue, the mucosa over the hard palate and a piece of tissue from her mouth.[8]

C. The trial court should have ordered a neutron activation analysis of People's Exhibit 32, a jar of formaldehyde containing the deceased's tongue and mucosa over the hard palate.[9]

D. Numerous other points which seek to establish the alleged incompe-

---

[8] Our review of the record indicates the basis for this contention is set forth in the "Pathological Report and Protocol" dated November 12, 1969, and a "Supplementary Report" to said report, dated March 12, 1970, both signed by Dr. Shalgos. These documents were apparently neither included as an exhibit in the trial or in the post-conviction petition. Rather, counsel for the defendant voluntarily attached said exhibit, without authority as an appendix to a brief in this court. Although the court will take judicial notice of the records of the "Coroner of Cook County" (see Ill. Rev. Stat. 1973, ch. 51, par. 48(b)), the proper procedure would have been for counsel for defendant to request the court to so do rather than follow the procedure of voluntarily including the document as an appendix in a brief. It should also be noted that the State's attorney also discussed the contents of the said protocol in his brief in the post-conviction appeal.

[9] During the oral argument on the State's motion to dismiss the post-conviction petition, counsel for defendant requested the court to order on its own motion that the exhibit be taken to the Argonne National Laboratory for neutron activation analysis, the defendant's theory apparently being that this analysis might shed some light on whether the deceased died as the result of an intra-oral shotgun wound.

tence of counsel by suggesting how present counsel would have tried the case based upon his analysis of the evidence and the trial of the first case.

■■ In order for the State to prove the defendant guilty of murder beyond a reasonable doubt, the State must show the death of a human being and the fact that the death was criminally caused by another. The State must show in this case that the decedent's death was not suicidal. Obviously, in this case the State must and can rely on circumstantial evidence, but in doing so the evidence must be not only consistent with the guilt of the defendant but must be inconsistent with the hypothesis of innocence. There must be a reasonable and moral certainty that the defendant murdered the deceased.

In this case the testimony of Dr. Shalgos, the State pathologist, was a critical link in the chain of circumstantial evidence. The allegations in the post-conviction petition with respect to the pathological examination including the examination of the tongue and mucosa over the hard palate, if found to be competent, relevant and material evidence may or may not have an effect on the finding of guilty of murder. Under the circumstances we believe fundamental fairness requires us to reverse the dismissal of the post-conviction petition by the trial court with directions as more particularly outlined in section II of this opinion.

As set forth in *People v. Airmers* (1966), 34 Ill.2d 222, 226, 215 N.E.2d 225, the function of the pleadings in a proceeding under the post-conviction act is to determine whether the petitioner is entitled to an evidentiary hearing. (See also *People v. Skorusa* (1973), 55 Ill.2d 577, 585, 304 N.E.2d 630.) As we said in *People v. Browry* (1st Dist. 1972), 8 Ill.App. 3d 599, 606, 290 N.E.2d 650:

> "Before a post-conviction petitioner becomes entitled to an evidentiary hearing, he must, in his petition, plead factual allegations, not conclusional statements. The allegations must make a substantial showing that constitutional rights were violated at his trial. (*People v. Hysell*, 48 Ill.2d 522, 527, 272 N.E.2d 38; *People v. Arbuckle*, 42 Ill.2d 177, 179, 246 N.E.2d 240.) A post-conviction petition that does not comply with these requirements may be dismissed without a hearing. (*People v. Spicer*, 47 Ill.2d 114, 264 N.E.2d 181; *People v. Morris*, 43 Ill.2d 124, 251 N.E.2d 202.)"

■■ Certain allegations set forth in the post-conviction petition, if proven, could raise the constitutional question of whether the defendant received a fair trial. A right to a fair trial is a right long protected by the due process clause of the fourteenth amendment of the U. S. Constitution and article I, section 2, of the 1970 Constitution of the State of Illinois. (See 1 Antieau, Modern Constitutional Law §§ 5:110—5:119 (1969).)

We, therefore, hold that certain allegations set forth in the post-conviction pleading, if proved, could amount to a substantial showing that defendant's constitutional rights were violated at his trial. In so holding, we agree, as urged by the State, there are many conclusional statements and arguments based on defendant's counsel's post-trial interpretation of trial evidence.[10] However, we again state that fundamental fairness requires that defendant be entitled to an opportunity to prove such allegations because, if proved, fundamental fairness would in turn require a new trial. In denying defendant's post-trial motion for a new trial, the trial judge disclosed very clearly the extent to which he had been affected by the fact that, under the evidence at the trial, "it would not have been possible for the deceased to have fired the shot herself"; this possibility is precisely the element which petitioner's factual allegations, if proved at the evidentiary hearing, will supply. On a retrial, the trier of fact may still conclude that the defendant, and not the victim, pulled the trigger, but he will not be able to reach that conclusion on the ground that it would have been physically impossible for the victim to have done so.

In *People v. McGuire* (1966), 35 Ill.2d 219, 220 N.E.2d 447, involving a defendant convicted of burglary, our supreme court remanded a case to the trial court for a new hearing on the admissibility of the defendant's confession and whether it was voluntarily made. In doing so, Mr. Justice Schaefer, speaking for the court, said:

> "Considerations of fairness may require that important evidence not be ignored, but there is a countervailing value in orderly procedure. We believe that this case should be remanded, not for a full new trial, but for a new hearing on the admissibility of the defendant's statement. At such a hearing both parties will have an opportunity to present further evidence. Compare *People v. Wright*, 30 Ill.2d 519; *People v. Beattie*, 31 Ill.2d 257; *People v. Jackson*, 31 Ill.2d 408." 35 Ill.2d 219, 229.

## B.

As noted earlier, defendant strongly urges in both appeals that he was denied a fair trial because of ineffective assistance of counsel. In the direct appeal defendant cites numerous examples which he maintains illustrate inadequate representation, *e.g.*, counsel erred in (1) stipulating as to the pathologists qualifications; (2) failing to cross-examine Dr. Shalgos from the pathological report and protocol prepared by the doc-

---

[10] We are confident that the experienced trial judge will be able to separate constitutional questions from conclusional statements; therefore, we are not dissecting the post-conviction petition in this opinion.

tor; and (3) failing to call additional pathologists on behalf of the defendant so as to properly challenge Dr. Shalgos' opinions.

■■ To substantiate this argument, it is well recognized that the defendant must establish not only that defense counsel was incompetent, but also that he (defendant) suffered substantial prejudice as a result of counsel's incompetency without which the outcome of the trial probably would have been different. (*People v. Goerger* (1972), 52 Ill.2d 403, 409, 288 N.E.2d 416; *People v. Palmer* (1964), 31 Ill.2d 58, 65, 198 N.E. 2d 839.) The alleged inadequacy cannot be the product of reflective hindsight or merely tactical errors. *People v. Palmer* (1964), 31 Ill.2d 58, 66.

In his appeal from the dismissal of his post-conviction petition without a hearing, defendant asserts that he was denied effective assistance of counsel at his trial in that defense counsel failed to present a reasonable theory of the case, failed to conduct a cross-examination of the pathologist testifying on behalf of the State based upon the protocol which he had prepared, failed to investigate the facts or the law of the case, and failed to effectively cross-examine other State witnesses.

■■ At the outset it is important to note that the only permissible ground for relief on a post-conviction petition is a substantial denial of a petitioner's constitutional rights in the proceeding resulting in his conviction. (Ill. Rev. Stat. 1971, ch. 38, par. 122—1; *People v. Ashley* (1966), 34 Ill.2d 402, 410, 216 N.E.2d 126.) As a general rule, a defendant who is represented by counsel of his own choice is not entitled to relief in a post-conviction proceeding on the ground of incompetency of counsel. Having selected his own counsel, defendant is then responsible if that counsel does not faithfully serve his interest and he cannot later contend, on a post-conviction hearing, that he was denied due process of law because his counsel was incompetent or negligent. *People v. Rose* (1969), 43 Ill.2d 273, 280, 253 N.E.2d 456; *People v. Clements* (1967), 38 Ill.2d 213, 215, 230 N.E.2d 185; *People v. Farmer* (1966), 34 Ill.2d 218, 219, 215 N.E.2d 232; *People v. Kirkwood* (1959), 17 Ill.2d 23, 25, 160 N.E.2d 766; *People v. Heirens* (1954), 4 Ill.2d 131, 143, 122 N.E.2d 231.

Of particular significance in the instant case, however, is that, while petitioner points to a number of deficiencies in his trial counsel's manner of representation, there is nothing in the record of the trial proceedings to show that petitioner brought these present contentions to his trial counsel's attention during the course of the trial.

In *People v. Brown* (1973), 54 Ill.2d 21, 294 N.E.2d 285, defendant appealed from the dismissal of his post-conviction petition without a hearing. At his trial the defendant did not testify in his own behalf, pursuant to his attorney's advice. Later defendant alleged in his post-

conviction petition that his attorney "refused to permit" him to testify in his own defense but made no statement either in his petition or in his accompanying affidavit that, when the time came for him to testify, he told his attorney that he wished to do so despite advice to the contrary. Such being the case, our supreme court concluded that: "In the absence of a contemporaneous assertion by the defendant of his right to testify, the trial judge properly denied an evidentiary hearing." 54 Ill.2d 21, 24.

■■ Thus, it is clear that when a defendant disagrees with a particular course of action pursued by his counsel during the trial and subsequently alleges in his post-conviction petition that such constitutes inadequate representation by counsel, the defendant must demonstrate within his petition that he gave his attorney timely notice of his disagreement. The appropriateness of this rule is quite obvious considering that, once a defendant has been found guilty, his attorney's advice will, in retrospect, undoubtedly appear to have been bad advice. As we said in *People v. Browry, supra*:

> "Hindsight is an incisive human faculty. Armed with it, a defendant can look back to the unpleasantness of his conviction and tell with precision what his counsel should have done prior to and during the trial. Our law, however, requires that a post-conviction petition contain more than a catalogue of failures on the part of counsel for the defense. It requires that the petition contain factual allegations which when supported by evidence, will show substantial prejudice to the rights of the defendant and from which it can be established that the outcome of the trial, had those failures not occurred, would probably have been different. [Citations.]" 8 Ill.App.3d 599, 605. See also *People v. Walker* (1974), 22 Ill. App.3d 711, 318 N.E.2d 111.

■■ We have reviewed the entire trial transcript. Defendant's trial counsel obviously had a certain trial strategy, or game plan. His adherence to that strategy, though not persuasive to the court, did not result in a trial that was a farce or sham. We find that as to this theory in each appeal, defendant's contention is without merit. (See *People v. Hall*, 25 Ill.App.3d 555, 323 N.E.2d 450.) We express this conclusion in order that upon remand of this cause the court and parties may focus or zero in on the real question of whether the matters noted in this opinion as alleged in the post-conviction petition in any way necessitate a new trial.

## II.

### A.

As noted above, we vacate the judgment of conviction of murder in case No. 55230. Rule 615(b) of our supreme court sets forth the power

of the reviewing court on appeal. (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b).) The power of our reviewing court to vacate judgments of conviction in the trial court and remanding the cause for a hearing on certain issues has been recognized by our supreme court in *People v. Blumenshine* (1969), 42 Ill.2d 508, 250 N.E.2d 152; *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469. However, in *People v. McGuire* (1966), 35 Ill.2d 219, 220 N.E.2d 447, the supreme court remanded a case with directions, without the judgment appealed from being vacated, reversed or affirmed; also see *People v. Johnson* (1967), 38 Ill.2d 399, 231 N.E.2d 447.

Case No. 55230 is hereby remanded to the trial court with directions that all matters on this cause be stayed pending a determination by the trial court of the post-conviction proceeding. Upon the conclusion of the post-conviction proceeding, the trial court shall then enter such order as may be appropriate and as discussed in the following paragraph.

## B.

For the reasons set out herein, in No. 58465 we reverse the order of the trial court granting the motion of the State to dismiss defendant's post-conviction petition, and we remand said cause back to the trial court to conduct such further proceedings and hearings consistent with the views expressed herein and as provided in the post-conviction act. (Ill. Rev. Stat. 1973, ch. 38, par. 122—1 *et seq.*) Thereafter, the trial court shall enter such orders as it then finds appropriate. If the court finds at the conclusion of said post-conviction proceeding that the original judgment of conviction of murder in cause No. 55230 is not affected, then a new judgment of conviction in said cause shall be entered and the said post-conviction petition shall be denied. On the other hand, if the court finds that a new trial is appropriate in No. 55230, then such an order shall be entered.

For the reasons hereinabove set forth, the judgment of the circuit court of Cook County in Cause No. 55230 is hereby vacated and remanded with directions; Cause No. 58465 is reversed and remanded with directions.

LEIGHTON and HAYES, JJ., concur.