Docket No. 81578–Agenda 2–March 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 DONALD BULL, Appellant.

CHIEF JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Fulton County, defendant, Donald Bull, was convicted of the first degree murder of Donna Tompkins and her daughter, Justine, the concealment of their homicidal deaths, and the aggravated arson of their home. See 720 ILCS 5/9–1(a), 9–3.1(a), 20–1.1(a)(1) (West 1992). Defendant chose to have the trial judge determine his sentence. At a separate sentencing hearing, the trial judge found defendant to be eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude the imposition of that sentence.

Accordingly, the trial judge sentenced defendant to death on the murder convictions, to a consecutive five-year prison term on the homicidal death convictions, and to a 30-year prison term on the aggravated arson conviction, consecutive to the death penalty and concurrent with the other prison term. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm.

BACKGROUND

The State's evidence at trial was essentially as follows. The victim, 30-year-old Donna Tompkins, worked at the Canton National Bank. Beginning in the spring of 1992, she also worked part-time as a waitress at the Canton Elks Club. In October 1992, she rented an apartment at 367 S. First Avenue in Canton for herself and for the other victim in this case, her three-year-old daughter, Justine.

A coworker of Donna's at the Elks Club, Iona Price, introduced Donna to defendant. He worked with Price's husband, Mike, deliv­ering furniture. Donna told defen­dant that she wanted to buy a sofa bed for her new apart­ment, and defendant responded that he had one to sell. Later that evening, Price warned Donna not to allow defendant into her apartment if she were ever there alone.

Defendant soon thereafter sold Donna a used sofa bed. She arranged for defendant to deliver the sofa while she and Justine were not at home. In her mailbox, she left for defendant a check for the sofa bed and the key to her apartment.

At 9 a.m., on January 13, 1993, Donna had not yet arrived at the bank. A coworker, Sheila Sisk, reported Donna's absence to her supervisor, David Haynes. He telephoned Donna's apartment and received her answering machine. A short time later, Sisk again telephoned Haynes and this time reported that Justine was not at her day care center. Sisk suggested that Haynes go to Donna's apartment and check on her.

At approximately 9:15 a.m., Haynes left the bank and drove a few blocks to Donna's apartment. He parked behind Donna's car in the garage driveway. He knocked on her apartment door and did not hear an answer. He attempted to look into the apartment through windows next to the door, but could not see anything. Haynes went to the adjoining apartment to speak with the owner of the building, Pauline Newcomb. She did not know if the victims were still at home. Haynes telephoned the bank from Newcomb's apartment; Donna was not there. Haynes then telephoned the Canton police depart­ment for assistance.

While on the phone, Haynes heard knocks on the wall or floor. After hanging up, he noticed a faint puff of smoke emanating from the adjoining wall. Haynes instructed Newcomb to leave her apartment.

Haynes ran to Donna's door; he still could not open it. He ran to a window and pulled out from the window an air conditioner. Smoke, under pressure, billowed out from the opening. Haynes ran back to the apartment door, broke a window in the door, reached inside and opened the door. He could see only smoke and a bright orange glow. Haynes ran to the rear of the building, broke out windows, and called out to the victims. Reaching inside for the victims, Haynes felt only furniture.

A police officer arrived, who called for the fire department. Firefighters soon arrived and extinguished the fire. The fire had been intentionally set, and had been fast, intense, and extremely hot.

Firefighters discovered the charred remains of the victims. They were found on the metal framework of the sofa bed, the bed extending from the sofa. Donna lay rigidly face-up on what had been the mattress; her legs hung over the edge of the mattress frame. Justine lay curled on her side next to her mother.

The victims and the sofa bed had been saturated with kerosene, gasoline, and whiskey. A trail of the accelerants had been poured to a pool formed by the door. The prosecution pathologist opined that the victims probably had been strangled or smothered to death prior to the fire. Also, Donna had drunk alcohol prior to her death, but the evidence conflicted as to when.

On the night before the fire, defendant was living approximately 10 blocks from the victim's home, at the home of his new girlfriend, Rochelle Hillemeyer. Also present were David Nell and several others. They played cards and drank beer. At approxi­mately 2 a.m., defendant borrowed Hillemeyer's car to drive Nell home. Hillemeyer went to bed. When she awoke at around 7 a.m., defendant had not yet returned.

Instead of driving Nell directly to his home, defendant drove around Canton drinking beer for approximately 30 minutes. Defendant twice drove past Donna's apartment. Each time defendant drove past, he pointed to the victims' apartment and told Nell that “he would like to f–k her,” referring to Donna. According to Nell, “he [defendant] said that about all girls though.”

Hillemeyer's mother, Jacqueline Day, drove to Hillemeyer's home on the morning of the fire to take one of her chil­dren to school. While Day was out doing er­rands, she noticed Hillemeyer's car parked within a block of the victims' apartment. Day stopped and exited her car, and inspected Hillemeyer's car. Day did not see a flat tire, or anything else wrong with the car. Day returned to Hillemeyer's home at around 8:30 a.m. Defendant had not yet returned.

At around 9:45 a.m., defendant returned with Hillemeyer's car. Defendant told Hillemeyer that he had a flat tire and had injured his leg while attempting to change the tire. Defendant further told Hillemeyer that he had entered the car and slept. However, upon inspection, Hillemeyer did not see any injury to defendant's leg. Defendant also mentioned that he had bloodstains on his coat as a result of his injury. When Hillemeyer told defendant that she had not seen any cuts on him, he responded that the stain was probably transmis­sion fluid. He washed his coat in their washing machine.

Defendant went to sleep. He stayed home from work even though he was scheduled to work that day. When he awoke, defendant took Hillemeyer's car to a garage and had all four tires replaced. Sometime during the next several months, defendant told Hillemeyer that “if the police ever want to search my things, you don't have to let them.”

On January 27, 1993, police investigators learned that Donna had bought the sofa bed from defendant. On that date, defendant repeated to the police what he told to Hillemeyer on the morning of the fire.

On March 21, 1993, Jo Ann Wright overheard defendant talking in a bar. He said that “he could kill somebody and get by with it and not get caught.”

Intact sperm was recovered from Donna's remains. Investigators requested blood samples from Donna's estranged husband, Jon Tompkins; her then-current boyfriend, Rod Franciskovich; a prior boyfriend, Terry Haynes; David Haynes; and defendant. The first four voluntarily complied. Defendant refused until around March 24, 1993, when he was arrested in a different case. In that case, the State obtained a search warrant for samples of defendant's blood, hair, and clothing fibers.

The Illinois State Police Forensic Science Laboratory determined that, of the five men, only defendant's DNA matched that of the sperm recov­ered from Donna's remains. Indeed, according to the prosecution DNA expert, the chance of the DNA recovered from Donna matching anyone other than defendant was at least one in 210 million.

On March 29, 1993, police investigators obtained Hillemeyer's consent to search defendant's possessions. Officers found a closed box in the bedroom that defendant had shared with Hillemeyer. In the box, officers found several rings. Witnesses identified one of these rings as belonging to Donna; further, she never took it off.

On July 15, 1993, defendant told Harold Crosier that he had sex with Donna a few days prior to her death. Defendant and Crosier were watch­ing a television program that discussed DNA. Defendant also told Crosier that blood could not have been found in Donna's apartment because it would have been incinerat­ed. Defendant also expressed concern over a ring that he had left at Hillemeyer's home.

In a letter to Mike Price dated July 17, 1993, defendant stated that he had sex with Donna on the Saturday or Sunday prior to her death. He further wrote: “that was my second time with her and my last.”

In March 1994, defendant confessed to Chris Chester that he had murdered the victims. Defendant told Chester the following. Defendant had a relationship with Donna. On the night of her murder, he had been drinking. He took her apartment key from her mailbox and woke her between midnight and 1 a.m. Donna told defendant that it was over between them, that it was a bad idea, and that all he wanted was money and sex. Donna slapped defendant. The next thing defendant remembered was waking up on top of her. When he came to, his hands were on Donna's face, leaning on her; she was dead. Defendant heard Justine in the next room, and did “the same thing” to her. Defendant then left Donna's apartment and walked to Hillemeyer's car, parked around the corner near a junkyard. A short time later, defendant returned to the apart­ment and wiped his fingerprints. He set the apart­ment on fire because he forgot something.

On June 30, 1994, defendant was charged in a 10-count indictment with seven counts of first degree murder, 
i.e.
, the intentional, knowing, and felony murder of Donna and Justine (720 ILCS 5/9–1(a)(1) through (a)(3) (West 1992)); two counts of concealment of homicidal death (720 ILCS 5/9–3.1(a) (West 1992)); and one count of aggravated arson (720 ILCS 5/20–1.1(a)(1) (West 1992)). Defendant was tried on all counts.

The defense case was essentially that the State failed to prove defendant guilty of the charged offenses beyond a reasonable doubt. The defense presented evidence that the victims were not strangled or smothered, as charged in most of the murder counts, but rather died from inhaling the superheated gases that the fire produced. The defense presented evidence that criti­cized the State's DNA testing method, and showed that defendant's DNA did not match that found in the semen recovered from Donna's remains. The defense, 
inter alia
, attacked the adequacy and fairness of the police investigation, the credibility of Crosier and Chester, and the identification of Donna's ring. The defense argued that there was no evidence that Donna had been sexually assaulted, as charged in the felony murder count. The defense also argued that the true murderer was David Haynes.

At the close of the evidence, the jury returned general verdicts of guilty for the crimes charged.

Defendant waived a sentencing jury. The trial judge found the presence of a statutory aggravating factor: defendant had been convicted of murdering two or more individuals. See 720 ILCS 5/9–1(b)(3) (West 1992). Thus, the trial judge concluded that defendant was eligible for the death penalty.

At the second stage of the capital sentencing hearing, the State presented evidence that included the following. In 1983, defendant was charged with strangling Donna Rupe, his former sister-in-law, nearly to the point of death. He repeated this several times until she eventually escaped. Defendant was convicted of aggravated battery and sentenced to a five-year prison term.

Defendant was charged with strangling Valerie Hilton, an acquaintance. On March 23, 1993, after a few drinks in a bar, defendant asked Hilton for a ride home. En route, he directed her to a park. Once there, defendant explained that he wanted to have sex with Hilton. She refused and started to drive away. Defendant turned off the car and strangled Hilton until she passed out. When she regained consciousness, she was face down in the back seat of her car. Hilton told defendant that she would not go to the police if he drove her home. Defendant drove her home, and she telephoned her brother. Hilton's brother took her to the police and then to a hospital. While defendant was incar­cer­ated for that offense, he was charged in this case. Defendant was ultimately convicted of aggravated battery. Two other women testified about their encounters with defendant, which did not result in criminal charges.

Defendant's mitigation evidence included the following. Defendant's IQ was low average; it ranked at the bottom 2% of the population. There were clear indications of brain dysfunction possibly resulting from a motorcycle accident. He has a language-

based learning disability, thinks slowly, and is mental­ly impaired. Defendant abused alcohol and drugs. Also, defen­dant loved his mother, whose death in 1990 had devastated him. Defendant was not close to his father, who had often called defendant stupid or dumb. Defendant had always tried to obtain his father's attention and to please him. However, defendant's father was an excessive drinker; he also was a gambler, and a womanizer; and he left the family when defendant was 15 years old. Defendant had married Rupe's sister and had two children. They divorced after defendant attacked Rupe.

At the close of the sentencing hearing, the trial judge concluded that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty:

“THE COURT: Will the defendant please rise? Mr. Bull, I have reviewed the factors in aggravation and mitigation in this case. I find, essentially, that [the State's] characterization is the correct one. There are no statutory factors in mitigation. In aggravation, you have caused the death of two people and you have a criminal record. The other factors in mitigation that were brought forth concerning your background and concerning your academic problems, concerning the problems you had growing up in your family, do not rise to the level of mitigation in the Court's view. In fact they don't even help understand, or anyone understand, what you have done here.

You snuck into this young women's [
sic
] apartment, at night, and you raped her. And you strangled her to death. And if you would have stopped there I think life without parole would have been an acceptable sentence, but you didn't stop there. You heard that little girl and you strangled her and then you set them on fire to cover your tracks. But you didn't cover your tracks because this isn't a totally circumstantial case. You left your little deposit, your DNA, in that young women [
sic
]. And despite your efforts to cover that up, you have been unsuccessful.

Like I said, if would [
sic
] you have stopped with Donna Tompkins I think life without parole would have been acceptable, but you didn't. You heard Justine; who couldn't hurt you. Who couldn't identify you. Couldn't have testified against you, and you killed her, and for that, Donald Bull, I sentence you to death.”

As stated earlier, the trial judge also sentenced defendant to prison terms on the other convictions. Also, defendant's prison sentences in this case were consecutive to the prison sentence he was then serving for his attack on Hilton. 

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

DISCUSSION

Defendant contends: (1) the search of his closed box in Hillemeyer's bedroom was unreasonable; (2) the questioning of a juror in his absence denied him several constitutional rights; and (3) the evidence was insufficient to prove him guilty beyond a reasonable doubt. Defendant also contends that he was denied a fair trial because the trial court: (4) barred defense cross-

examination of the prosecution DNA expert regarding his disciplinary record with the state police crime laboratory, and (5) admitted an out-of-court statement of Iona Price during her testimony and por­tions of the testi­mony of Jon Tompkins. Defendant contends (6) he did not receive a fair sentencing hearing at the death eligi­bility phase because find­ings were not made as to the mental states re­quired for death penalty eligibility. Defendant con­tends (7) the trial court erred by denying his several 
pro se
 post-trial motions without an evidentiary hearing. Defendant also contends (8) that the Illinois death penalty statute is uncon­stitutional because the death penalty will inevita­bly be applied to innocent persons, and the statute pre­cludes meaningful consideration of mitigating circumstances.

I. Search of Closed Box

Defendant first contends that the trial court erred in denying his motion to suppress as evidence the ring identified as belonging to Donna. Defendant claims that the search of his closed box in Hillemeyer's bedroom was unreasonable and, consequently, he must receive a new trial.

The hearing on the motion to suppress elicited the following uncontested facts. In January 1993, defendant moved his belongings into Hillemeyer's home. He lived with her and shared her bedroom until his arrest on March 23, 1993, regarding the Hilton attack. Included with defendant's possessions was a cardboard box, which had been a container for a bottle of liqueur. Defendant used the box as a “collection box,” or a “piggy bank”; he “threw odds and ends in it.” Sometimes he kept the box in a dresser; sometimes he kept the box beside the dresser. Defendant had never permitted Hillemeyer to look in the box; she had never asked to do so.

On March 29, 1993, defendant was in the local jail. Illinois State Police Agent Kenneth Kedzior and Canton Police Ser­geant David Ayers went to Hillemeyer's home and asked if they could search her home. She consented and signed a printed consent form. The officials asked Hillemeyer specifically whether there was any area of the premises to which she did not have access; she answered in the negative.

In the bedroom, the officials discovered the closed box on the floor beside a dresser. Hillemeyer stated that the box and its contents belonged to defendant. The officials asked her if she had access to the box, and she answered that she did. The officials also asked Hillemeyer if she knew what was in the box, and she answered that she did not.

The police opened the box. It contained coins, a key, a ring with a black setting, and a ring with a clear setting. Hillemeyer told the officials that defendant previously had shown her the ring with the black setting. She had not previously seen the key or the ring with the clear setting. Witnesses subse­quently identified the ring with the clear setting as belonging to Donna. At the close of the hearing, the trial court denied defendant's motion to suppress.

Defendant contends that the search of his box violated the United States and Illinois Constitutions. See U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6. We note that this court, as a general rule, in interpreting the search and seizure provision in the Illinois Constitution, looks to the United States Supreme Court's interpretation of the fourth amendment. See 
People v. Mitchell
, 165 Ill. 2d 211, 217-23 (1995); 
cf. People v. Krueger
, 175 Ill. 2d 60, 74 (1996) (“We knowingly depart from that tradition [of applying the lockstep doctrine] here for the reasons set forth below”). Also, a reviewing court gener­ally will not disturb a trial court's determination of a motion to suppress evidence unless it is manifestly erroneous. However, in this case, the parties do not question the facts or the credibility of the witnesses. Thus, 
de novo
 review is appropriate. See 
People v. Foskey
, 136 Ill. 2d 66, 76 (1990).

The fourth amendment prohibits the warrantless search of a person's home as 
per se
 unreasonable. However, there are a few specifically established and well-delineated exceptions to the warrant requirement. One such exception is a search conducted pursuant to consent. 
Schneckloth v. Bustamonte
, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44 (1973).

This consent may be obtained not only from the individual whose property is searched, but also from a third party who possesses common authority over the premises. 
Illinois v. Rodriguez
, 497 U.S. 177, 181, 111 L. Ed. 2d 148, 156, 110 S. Ct. 2793, 2797 (1990). A court should not infer common authority from the mere property interest a third person has in the proper­ty. The authority that justifies third-party consent is not based on the law of property. Rather, such authority is based on mutual use of the property by persons generally having joint access or control for most purposes. Therefore, it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his or her own right, and that the others have assumed the risk that one of their number might permit the common area to be searched. 
United States v. Matlock
, 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7 (1974), 
adopted in People v. Stacey
, 58 Ill. 2d 83 (1974). The burden of estab­lish­ing common author­i­ty rests on the govern­ment. 
Rodriguez
, 497 U.S. at 181, 111 L. Ed. 2d at 156, 110 S. Ct. at 2797.

Defendant does not challenge the voluntariness of Hillemeyer's consent, but rather challenges its scope. Defendant argues that Hillemeyer could legally consent only to a search of her own property, and not to a search of his closed container. “A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home.” 
United States v. Karo
, 468 U.S. 705, 725, 82 L. Ed. 2d 530, 548, 104 S. Ct. 3296, 3308 (1984) (O'Connor, J., concurring, joined by Rehnquist, J.); accord 
United States v. Rodriguez
, 888 F.2d 519, 523 (7th Cir. 1989); 
People v. Gonzalez
, 88 N.Y.2d 289, 294 n.1, 667 N.E.2d 323, 325 n.1, 644 N.Y.S.2d 673, 675 n.1 (1996) (collecting cases). When a homeowner permits entry into her home of a guest's private container to which the owner does not have the right of access, the homeowner effectively surrenders a segment of the privacy of her home to the privacy of the container's owner. Such a home­owner lacks the power to give effective consent to the search of the closed container. 
Karo
, 468 U.S. at 726, 82 L. Ed. 2d at 548-49, 104 S. Ct. at 3309 (O'Connor, J., concurring, joined by Rehnquist, J.).

In this case, when police officials found defendant's box, they questioned Hillemeyer specifically as to her common authority over the box,
 separate from her common authority over the premises.

Defendant counters that police officials should have known that Hillemeyer's consent was inadequate. However, a warrantless search based on the consent of a person having apparent, though not actual, authority to give such consent is lawful if, at the time of the search, the police reasonably believe that person to have common authority over the place or item to be searched. 
Rodriguez
, 497 U.S. at 186-89, 111 L. Ed. 2d at 160-61, 110 S. Ct. at 2800-01.

In this case, Hillemeyer stated that she was familiar with and had access to the box. The mere fact that defendant alone may have used the box does not indicate that Hillemeyer was denied the mutual use, access to, or control over it. See 
Stacey
, 58 Ill. 2d at 89-90; 
People v. Ford
, 83 Ill. App. 3d 57, 63 (1980); 3 W. LaFave, Search & Seizure §8.3(f), at 740 n.92 (3d ed. 1996). Based on these uncontested facts, we hold that police officials could reasonably believe that Hillemeyer had common authority over the box. We agree with the trial court that Hillemeyer had the requisite common authority, either actual or apparent, to consent to the search of defendant's box.

II. Defendant's Absence from Juror Questioning

Defendant next contends that the trial court erred by conducting an 
in camera voir dire
 of a juror in the presence of the attorneys, but in the absence of defendant. He claims that this conference denied him several constitutional rights, requiring a new trial.

During the weekend prior to trial, juror Catherine McCormack contacted the trial judge to inform him of a conversation she had regarding the case. In response, the judge held an 
in camera
 conference immediately prior to the jury being sworn and opening statements made. Present were prosecution and defense attorneys, but defendant was absent.

McCormack stated as follows. On the day after jury selection, a former coworker unexpectedly came to McCormack's home. In fact, the visitor said that she had stopped by earlier looking for McCormack. They spoke of a number of topics. During their conversation, McCormack told the visitor that she was on jury duty. The visitor responded: “Oh yeah, the murder trial. I hear he's done this before.” After the visitor left, McCormack realized that they had been discussing the trial, worried about the conversation, and telephoned the trial judge.

The trial judge asked McCormack if she had any other conversations regarding the trial; McCormack responded that she had not. However, McCormack further stated that, subsequent to jury selection, she remembered a chapter from her past. During jury selection, the trial judge asked if any of the prospective jurors had been crime victims. McCormack failed to say that her mother and herself had been battered in past relationships. However, in response to the trial judge's further ques­tion­ing, McCormack added that these prior incidents did not result in any crimi­nal charg­es. In response to questioning by defense counsel, McCormack stated that she had undergone therapy, she thought that her emotions flowing from these abusive relationships were behind her, and she was shocked to discover that they were not. McCormack stated that if defendant and the victim knew each other and had an abusive relationship, she did not know if she could be impartial.

Defendant's trial counsel requested a recess, left the conference, and conferred with defendant. On their return, defense counsel informed the judge that they did not object to McCormack remaining on the jury. The trial judge instructed McCormack not to consider what she had learned outside of the record. The judge noted that every juror brings to a trial his or her “baggage,” which we take to mean personal history and experienc­es, and expressed to McCormack confidence that she would be fair and impartial. The jury subsequently chose McCormack to be their foreperson.

Initially we agree with the State that this issue is waived for review. Defendant first raised the issue in his post-trial motion; he did not object prior to the jury being sworn. “ `An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities.' ” 
People v. Ramey
, 151 Ill. 2d 498, 522 (1992), quoting 
People v. Ford
, 19 Ill. 2d 466, 478-79 (1960). Thus, the issue is waived. See 
People v. Towns
, 157 Ill. 2d 90, 99-

100 (1993).

Defendant further asks this court to consider the issue under the plain error doctrine, claiming the denial of several constitutional rights. 134 Ill. 2d R. 615(a). Plain error is a narrow and limited exception to the general waiver rule. Plain error is invoked only where the evidence is closely balanced, or the alleged error is so substan­tial that it deprived the defendant of a fair trial. 
People v. Hampton
, 149 Ill. 2d 71, 100 (1992).

A criminal defendant has a general right to be present at every stage of trial, including jury selection. However, the situations in which the denial of this broad right of presence actually violates the Illinois and United States Constitutions are limited. Under the Illinois Constitution, a criminal defendant “is not denied a constitutional right every time he is not present during his trial, but only when his absence results in a denial of an underlying substantial right, in other words, a constitutional right; and it is only in such a case that plain error is committed.” 
People v. Bean
, 137 Ill. 2d 65, 80-81 (1990). Defendant contends that his absence from the McCormack conference denied him the right to an impartial jury. Ill. Const. 1970, art. I, §8.

Defendant contends that his absence from the McCormack conference also denied him the due process of law under the United States Constitution. U.S. Const., amend. XIV. Under the due process clause of the fourteenth amendment, a criminal defendant's right of presence is violated only when the defendant's absence results in the denial of a fair and just trial. Specifically, in this case, the fairness issue concerns the impartiality of defendant's jury. The question we must answer is the same under article I, section 8, of the Illinois Constitution: Did defendant's absence from the McCormack conference cause him to be tried, convicted, and sentenced by a jury prejudiced against him? See 
Bean
, 137 Ill. 2d at 82-85.

Defendant reasons that because McCormack, the jury foreperson, possessed knowledge of him outside of the record, and had personal history and experiences that caused her to doubt her ability to be impartial, then McCormack was prejudiced against him. Defendant notes McCormack's statements that if she learned that he and Donna had an abusive relationship, then she did not know if she could be impartial. Defendant argues that he was forced to rely on his trial counsel's reports of McCormack's statements, rather than his own first-hand observation of McCormack. Defendant argues that had he been present, he “could have seen how upset the juror had been and how she reacted to his presence,” and would have “been in a better position *** to judge whether the juror was likely to share her prejudicial information and experiences with the other jurors.”

We cannot accept defendant's argument. The record does not indicate in any way that McCormack was “upset” about anything. The record also does not indicate how McCormack would have “reacted to his presence” differently than during jury selection or, for that matter, during the remainder of the trial. This court has observed:

“It is not necessary that jurors be unaware of the case before they assume their roles in the jury box. Crimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in their community would not have heard of any of the cases which they are called upon to judge in court. Total ignorance of the case is exceptional, and it is not required. [Cita­tion.] What is required is the assurance that a juror will be able to set aside all information he has ac­

quired outside the courtroom, along with any opinions he has formed, and decide the case strictly on the evidence as presented in the courtroom. [Citation.]” 
People v. Taylor
, 101 Ill. 2d 377, 386 (1984).

Also, despite McCormack's personal history and experienc­es, she previously stated during 
voir dire
 that she would be fair and impartial. At the conference, the trial judge was in a posi­tion to evaluate McCormack's responses to question­ing, and to determine that McCormack would be fair and impar­tial. On this record, we cannot set aside the trial judge's determination. See, 
e.g.
, 
People v. John­son
, 162 Ill. App. 3d 952, 954-55 (1987).

The record does not even suggest that McCormack, or the jury as a whole, was actually prejudiced against him. Thus, we hold that defendant failed to show that he did not receive an impartial trial.

We lastly note defendant's related claim that he was denied his right to effective assistance of counsel with respect to this issue. U.S. Const. amends. VI, XIV. Defendant contends that his trial counsel's failure to insist on defendant's presence at the McCormack conference, and to seek dismissal of “the prejudiced juror,” amounted to constitutionally deficient performance requiring a new trial.

To establish a claim of ineffective assistance of counsel, a criminal defendant must satisfy the familiar 
Strickland
 test. See 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The test is composed of two prongs: deficiency and prejudice. To establish prejudice, the defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamental­ly unfair. 
People v. Griffin
, 178 Ill. 2d 65, 74 (1997).

However, a court need not consider whether counsel's performance was deficient prior to examining the prejudice that the defendant suffered as a result of the alleged deficiency. If the ineffec­tive-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, the court need not decide whether counsel's performance was constitu­tionally deficient. 
Griffin
, 178 Ill. 2d at 74; 
People v. Flores
, 153 Ill. 2d 264, 283-84 (1992).

In this case, we previously concluded that defendant failed to show that McCormack or the jury as a whole was actually prejudiced against him. Thus, defendant fails the prejudice prong of the 
Strickland
 test. We hold that defendant's absence from the McCormack conference did not deny him his constitutional rights to an impartial jury, due process of law, or effective assistance of counsel.

III. Sufficiency of the Evidence

Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. 
People v. Eyler
, 133 Ill. 2d 173, 191 (1989).

Defendant argues that the State's case can be explained as consistent with his innocence. Defendant points to the defense expert DNA testimony and the conflict it created with the prosecution expert DNA testimony. Defendant further notes that even if his DNA was found in Donna's remains, it can be explained by the evidence that he and Donna had a sexual relationship prior to her murder. Defendant also attacks the credibility of Crosier and Chester, and the identification of Donna's ring found in defendant's box. Defendant also points to evidence which he claims implicates David Haynes in the murders.

It is not the function of a reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence. Rather, it is the function of the fact finder to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. 
People v. McDonald
, 168 Ill. 2d 420, 448-49 (1995); 
People v. Tye
, 141 Ill. 2d 1, 13 (1990). It is for the fact finder to resolve conflicts or inconsistencies in the testimony of the witnesses. 
People v. Phillips
, 127 Ill. 2d 499, 514 (1989). When weighing the evidence, the fact finder is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. 
McDonald
, 168 Ill. 2d at 447. Also, speculation that another person might have committed the offense does not necessarily raise a reasonable doubt of the guilt of the accused. 
People v. Herrett
, 137 Ill. 2d 195, 206 (1990).

Defendant's arguments address functions of the jury and not of this court. After reviewing the record in the light most favorable to the prosecution, we cannot say that the evidence was so improbable or unsatisfactory that no rational fact finder could have found defendant guilty beyond a reasonable doubt of the crimes charged.

IV. Cross-Examination of Prosecution DNA Expert

Defendant contends he was denied a fair trial because the trial court barred defense cross-examination of David Metzger, the prosecution DNA expert, regarding his disciplinary record with the State Police crime laboratory. Prior to trial, the trial court granted the State's motion 
in limine
 to bar cross-examination of Metzger regarding a disciplinary incident. In 1993, Metzger performed the DNA tests in this case. The State Police brought administrative charges against Metzger, accusing him of stealing a microscope in January 1995. In May 1995, the State Police and Metzger entered into a settlement agreement. The State Police agreed not to discharge Metzger, and disciplined him with a 100-

day suspension without pay. Metzger agreed to perform 120 hours of community service as directed and monitored by the State Police, and voluntarily forfeited his accrued vacation time.

The sixth amendment right of confrontation includes the right to cross-examine a witness regarding the witness' biases, interests, or motives to testify. A witness may be impeached by attacking her character. Only criminal convictions may be used; proof of arrests or other charges are inadmissible. However, another accepted method of impeachment is to show a witness' bias, interest, or motive to testify. With this method of impeachment, the defendant may show or inquire into the fact that a witness has been arrested or otherwise charged with a crime where it would reasonably tend to show that the witness' testimony might be influenced by interest, bias, or a motive to testify falsely. 
People v. Lucas
, 151 Ill. 2d 461, 491-92 (1992); 
People v. Triplett
, 108 Ill. 2d 463, 475 (1985).

Thus, although evidence of arrests or other charges is not admissible to impeach credibility generally, such evidence is admissible to show that the witness' testimony may be influenced by bias, interest, or motive to testify falsely. However, the evidence that is used must give rise to the inference that the witness has something to gain or lose by his or her testimony. Therefore, the evidence used must not be remote or uncertain. 
Triplett
, 108 Ill. 2d at 475-76.

In the present case, defendant contends that Metzger's disciplinary record shows his motive to testify falsely or to embellish his testimony to please his employers. Defendant argues as follows. At the time of trial, Metzger “remained under a cloud of disgrace” with the State Police. He had “perilous job security” with the agency. Indeed, his poor standing increased the risk that negative critiques of his job performance, such as from the defense DNA expert, would cause him to be fired. Therefore, defendant reasons, Metzger “was strongly motivated to testify in a biased manner in defense of his performance.”

However, we agree with the trial court that Metzger's administrative disciplinary record would have been inadmissible to impeach him. The record is too speculative and remote to infer that Metzger had something to gain or lose by his testimony. As the trial court noted, the administrative charges arose approximately two years 
after
 Metzger had completed and reported his DNA analysis in this case. Further, trial occurred approximately one year after Metzger was disciplined. At trial, Metzger's testimony regarding his DNA analysis of defendant was based on the three-year-old report. We uphold the trial court's order barring defense cross-exami­na­tion of Metzger regarding his administrative disci­plinary record.

V. Erroneously Admitted Evidence

Defendant next assigns error to the admission of a portion of the testimony of Iona Price and much of the testimony of Jon Tompkins. The admission of evidence at trial is a matter within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion. 
People v. Ward
, 101 Ill. 2d 443, 455-56 (1984).

A. 
Iona Price

Defendant contends the trial court erred by admitting into evidence an out-of-court statement of Iona Price that she repeated during her testimony. Price testified that after she intro­duced Donna to defendant, she warned Donna not to allow defendant into her apartment if she were ever there alone. Defendant argues that Price's out-of-court statement was inadmissible because it was irrelevant, prejudicial hearsay.

Although defendant objected to this statement at trial, he concedes that trial counsel failed to include this issue in defendant's post-trial motion. Thus, the issue is waived. 
People v. Young
, 128 Ill. 2d 1, 38-40 (1989); 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Defendant invokes the plain error rule (134 Ill. 2d R. 615(a)), claiming that this statement was highly prejudicial because the evidence was closely balanced. We disagree; the record contains abundant evidence of defendant's guilt. After reviewing the record, we conclude that this issue does not warrant our consideration under the plain error doctrine.

B. 
Jon Tompkins

Defendant also contends that the trial court erred by admitting into evidence much of the testimony of Donna's estranged husband, Jon Tompkins. Defendant characterizes much of Tompkins' testimony as concerning “the irrelevant prejudicial aspects of his grief and his loving relationship with his daughter prior to her murder.” The State responds that this testimony was admissible as relevant evidence of the victim's activities prior to their murder.

The record shows that trial counsel failed to object at trial to these portions of Tompkins' testimony. Thus, the issue is waived. 
Enoch
, 122 Ill. 2d at 186-87. We further conclude that this issue does not warrant our consideration under the plain error doctrine.

C. 
Effective Assistance of Counsel

We note defendant's related claim that his trial counsel was constitutionally deficient for failing to preserve the above issues for review. We conclude that defendant fails the prejudice prong of the 
Strickland
 test. Even assuming that the above evidence was erroneously admitted, we conclude that there is no reasonable probability that the result of the trial would have been different. Counsel's allegedly deficient performance in this regard did not render the result of the trial unreliable or the proceeding fundamentally unfair. See 
Griffin
, 178 Ill. 2d at 74.

VI. Death Eligibility

Defendant next contends he was denied due process of law at the death eligibility phase of the sentencing hearing because findings were not made as to the mental states required for death penalty eligibility. The statutory aggravating factor making defendant eligible for the death penalty was that he had been convicted of murdering two or more individuals. This aggravating factor includes an intent requirement: either the defendant intends to kill more than one person, or kills with knowledge that his separate acts create a strong probability of death or great bodily harm. 720 ILCS 5/9–1(b)(3) (West 1992).

Defendant notes that the trial jury was instructed as to all three forms of murder–intentional, knowing, and felony murder–but returned only a general verdict of guilty each for Donna and Justine. Also, the sen­tencing judge found the presence of the statutory aggra­vating factor by taking judicial notice of the murder convictions, without making an additional, express finding as to intent. Defendant claims that this omission requires a new sentencing hearing.

We disagree. In 
People v. Johnson
, 149 Ill. 2d 118 (1992), this court noted that the general verdict of guilty included a conviction of intentional murder, and that the sentencing judge took judicial notice of the verdict. This court reasoned that “[s]ince the verdict encom­passed the necessary finding of intent, there was no omission on the part of the trial judge, and defendant's argument must fail.” 
Johnson
, 149 Ill. 2d at 157. Also, as recently noted in the special concurrence in 
People v. Harris
, No. 80084 (April 16, 1998), “the jury's verdicts, when viewed in conjunction with all of the evidence adduced at the trial 
which the trial judge heard
, form the basis for affirming the 
trial judge's
 specific finding of death eligibility on appeal.” (Emphasis in origi­

nal.) 
Harris
, slip op. at 36 (Freeman, C.J., specially concurring). Defendant's argu­ment must fail.

VII. 
Pro Se
 Post-Trial Motions

Defendant next contends the trial court erred by denying his 
pro se
 post-trial motions without an evidentiary hearing. The record shows that defendant filed several 
pro se
 post-trial motions, including motions for a new trial, substitution of counsel, and delay of sentencing. The motions alleged ineffective assistance of counsel. Defendant asks us to remand this cause for a hearing on his allegations of ineffective assistance of counsel, “which may require the appointment of new counsel to investigate and argue the failings of trial counsel.”

When a defendant presents a 
pro se
 post-trial claim of ineffective assistance of counsel, the trial court may, under certain circumstances, appoint new counsel to assist the defendant in presenting his claim. However, the trial court should first examine the factual basis for defendant's claims. After this examination, if the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then new counsel need not be appointed and the 
pro se
 motion can be denied. However, if the allegations show possible neglect of the case, new counsel should be appointed. 
People v. Robinson
, 157 Ill. 2d 68, 86 (1993); accord 
People v. Towns
, 174 Ill. 2d 453, 466 (1996). The ap­point­

ed counsel can then inde­pen­dently evalu­ate the defendant's claim and would avoid the con­flict of inter­est that trial counsel would experi­ence if she had to justify her actions contrary to her client's position. 
People v. Pope
, 284 Ill. App. 3d 330, 333 (1996); 
People v. Giles
, 261 Ill. App. 3d 833, 847 (1994). “[T]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the 
pro se
 defendant's allega­

tions of ineffective assistance of counsel.” 
People v. Johnson
, 159 Ill. 2d 97, 125 (1994).

We conclude that the trial court ade­quately in­quired into defendant's allegations of ineffective assistance. Defen­dant now contends “the trial court did nothing to ascertain whether the allegations of ineffective assistance of counsel at trial were spurious or pertained to strategy.” Howev­er, the record shows that the trial court did investigate defendant's allegations. The court heard from defendant and his two trial counsel. Only after this examination did the court find that defendant's allegations were spurious and, accordingly, denied defendant's motions. We uphold the trial court's ruling.

VIII. Constitutionality of Death Penalty Statute

Defendant lastly contends the Illinois death penalty statute is unconstitutional (U.S. Const., amends. VIII, XIV; Ill. Const. 1970, art. I, §§2, 11) for two rea­sons.

A. 
Inevitable Execution of Innocent Persons

Defendant first claims that the Illinois death penalty statute is unconstitutional because of “the inevitability that innocent persons will be wrongly convicted of capital crimes and executed.” As examples, defendant points to several cases in which those defendants have been exonerated and released from death row after they had been convicted of capital crimes and sentenced to death. Defendant argues that the irreversibility of the death penalty “makes the inevitability of error in the imposition of the death penalty constitutionally unacceptable.”

The State's sole response is a description of the many meaningful procedural safeguards that a criminal defendant enjoys throughout the various stages of the judicial process, including trial, post-trial, direct appellate review, post-conviction and federal 
habeas corpus
 review, and executive clemency. However, defendant expressly argues:

“
No amount
 of procedural due process can prevent all of the errors that can result in such miscarriages of justice. Perjury, mistaken identifications, errors in forensic testing, racial bias, and countless other sources of factual error will remain, despite the right to coun­sel, the confrontation clause, the right to an impar­tial jury, or the right of appeal and habeas corpus.” (Emphasis added.)

An important goal of the criminal justice process is the protection of the innocent accused against an erroneous conviction. Many would argue that it is the goal of the highest priori­ty. 1 W. LaFave & J. Israel, Criminal Procedure §1.6(c), at 44 (1984). The interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. The many safeguards that the law has developed over the years to diminish the risk of erroneous conviction stand as a testament to this concern. 
Ake v. Oklahoma
, 470 U.S. 68, 78, 84 L. Ed. 2d 53, 63, 105 S. Ct. 1087, 1093 (1985).

Whatever the number of safeguards in the system, the American criminal justice process is necessarily imperfect because it is operated by people and people are imperfect. Nonetheless, it remains one of the best in the world, and the only system we have. The United States Supreme Court has held that “the death penalty is not a form of punish­ment that may never be imposed, regardless of the circum­stances of the offense, regardless of the character of the offender, 
and regard­less of the procedure followed in reach­ing the decision to impose it
.” (Emphasis added.) 
Gregg v. Georgia
, 428 U.S. 153, 187, 49 L. Ed. 2d 859, 882-83, 96 S. Ct. 2909, 2932 (1976). We view this holding as including the deter­mination of guilt. We note that other courts have rejected this exact argument. See, 
e.g.,
 
United States v. Bradley
, 880 F. Supp. 271, 291-92 (M.D. Pa. 1994); 
United States v. Pretlow
, 779 F. Supp. 758, 777-

78 (D. N.J. 1991) (both citing 
Gregg
); see also 
State v. Stenson
, 132 Wash. 2d 668, 758 n.24, 940 P.2d 1239, 1284 n.24 (1997) (court acknowledged issue, but declined to suspend operation of the death penalty absent finding of constitutional deficiency).

One might be tempted to accept defendant's argu­ment that the Illinois death penalty statute is unconstitu­tional because innocent persons will inevitably be convicted of capital crimes, sentenced to death, and executed. However, it must be remembered that defendant's argument does not address the issue of procedur­al deficiency in the criminal justice system. We stress that defendant argues that “
[n]o amount
 of procedural due process can prevent all of the errors that can result in” an innocent person being convicted of a capital crime. (Emphasis added.) Thus, defendant's stri­dent protest is against the concept of the Anglo-American crimi­nal trial itself as the means of deter­min­ing the guilt or inno­cence of an accused.

This inexplicable attack on the American crimi­nal trial as the means of determining guilt requires a discus­sion of fundamen­tal principles.

“The system of criminal justice America uses to deal with those crimes it cannot prevent and those criminals it cannot deter is not a monolithic, or even a consistent system. It was not designed or built in one piece at one time. Its philosophic core is that a person may be punished by the Government if, and only if, it has been proved by an impartial and deliberate process that he has violated a specific law. Around that core layer upon layer of institutions and proce­dures, some inspired by principle and some by expedien­cy, have accumulated. *** The entire system repre­sents an adaptation of the English common law to Ameri­ca's peculiar structure of government ***.” President's Comm'n on Law Enforcement and Administra­tion of Justice, The Challenge of Crime in a Free Society 7 (1967).

In this country and in this state, a defen­dant has a constitutional right to have the charges brought against him proven beyond a reason­able doubt. The forum for such a determi­nation is a trial. The guilt or innocence determination in a crimi­nal trial is a “ `decisive and portentous event.' `Society's resources have been concen­trated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.' ” 
Herrera v. Collins
, 506 U.S. 390, 401, 122 L. Ed. 2d 203, 217, 113 S. Ct. 853, 861 (1993), quoting 
Wainwright v. Sykes
, 433 U.S. 72, 90, 53 L. Ed. 2d 594, 610, 97 S. Ct. 2497, 2508 (1977).

The purpose of a trial is to have witnesses and evi­dence against the defendant put before the trier of fact so they can be tested by way of cross-examina­tion, the belief being that the truth will become apparent as a result of this process. At the trial, the defendant has an opportunity to call witnesses on his own behalf and to testify should the defendant choose to do so. 6 L. Pieczynski, Illinois Practice §26.1, at 212 (1989). Additional features of an American crimi­nal trial include the presumption of inno­cence, the right of the defendant not to testify on his own behalf, the right to the effective assistance of counsel, and the exclu­sion of evidence ille­gal­ly ob­tained by the state. 1 W. LaFave & J. Israel, Crimi­nal Proce­dure §1.4, at 28 (1984); see generally 1 W. LaFave & J. Israel, Criminal Proce­dure §1.6 (1984); 2 W. LaFave & J. Israel, Criminal Procedure §§11.1 through 11.10 (1984).

A criminal defendant, whether guilty or innocent, is enti­tled to a fair, orderly, and impartial trial, as described above, conducted according to law. 
People v. Kalpak
, 10 Ill. 2d 411, 428 (1957). This right is protected by the United States and Illi­nois Constitutions. U.S. Const., amend. XIV (due process clause); Ill. Const. 1970, art. I, §2; see 
People v. Hoffman
, 379 Ill. 318, 322 (1942); 
People v. Garrett
, 26 Ill. App. 3d 786, 801 (1975). “It is an unalter­able fact that our judicial system, like the human beings who administer it, is fallible.” 
Herrera
, 506 U.S. at 415, 122 L. Ed. 2d at 226, 113 S. Ct. at 868. This court has ob­served that trials cannot be con­duct­ed without error, and that perfec­tion in trial proce­dure is virtual­ly unattainable. 
People v. Agnello
, 22 Ill. 2d 352, 363 (1961). Thus, it is funda­men­tal that a defen­dant in a crimi­nal case is enti­tled to a fair trial, not a perfect one. 
People v. Griffin
, 178 Ill. 2d 65, 90-91 (1997); 
People v. Ruiz
, 94 Ill. 2d 245, 260 (1982), citing 
Lutwak v. United States
, 344 U.S. 604, 619-20, 97 L. Ed. 593, 605, 73 S. Ct. 481, 490 (1952); accord 23A C.J.S. Criminal Law §1145, at 5 (1989).

Defendant's complaint is simply that the American criminal trial, as the means of determining the guilt or innocence of an accused, is not perfect. However, as imper­fect as he de­scribes the system, defendant does not suggest a substi­tute for this system as the means of deter­mining guilt or inno­cence. Indeed, in a sense, defendant's protest is unan­swer­able. Have mis­takes been made? Will mis­takes be made? Certainly.

“The American criminal justice system regards the trial as the best method for determining a defendant's guilt. Yet a trial is not a scientific process. Instead of calm, consistent evaluations of evidence, trials in­volve unpredictable human perceptions and reactions. *** [T]rials are very human processes, and the truth is not guaranteed to emerge in the final verdict.” G. Cole & C. Smith, The American System of Criminal Jus­tice 372-73 (8th ed. 1998).

However, the American criminal justice system, like perhaps no other system in the world, provides the maximum protection necessary to guard against mistakes being made.

“What most significantly distinguishes the [criminal justice] system of one country from that of another is the extent and the form of the protections it offers individuals in the process of determining guilt and imposing punishment. Our system of justice deliberate­ly sacrifices much in efficiency and even in effective­ness in order to *** protect the individual. Some­times it may seem too much.” President's Comm'n on Law Enforcement and Administration of Justice, The Chal­lenge of Crime in a Free Society 7 (1967).

We note that the partial dissent asserts that “legislatures and the courts appear to have abandoned any genuine concern with insuring the fairness and reliability of the system.” Slip op. at 36 (Harrison, J., concurring in part and dissenting in part). However, both this court and the General Assembly have included additional safeguards with the many protections that a criminal defendant enjoys in the continuing process of the criminal justice system.

Based on the Illinois Constitution, this court has recog­nized that a defendant's right against self-incrimination is violated where the police deny an attorney, retained for the defendant without her knowledge, physical access to the defendant during the interrogation and where the police do not inform the defendant that the attorney is seeking to consult with her at the police station. 
People v. McCauley
, 163 Ill. 2d 414 (1994). Also based on the Illinois Constitution, this court has recog­nized that a free standing claim of newly discovered evidence of innocence raises a constitutional question properly considered in a post-conviction petition. 
People v. Washington
, 171 Ill. 2d 475 (1996). Also, the legislature has recently enacted a law to allow prisoners to obtain previously unavailable DNA testing of relevant pieces of physical evidence. 725 ILCS 5/116-3 (West Supp. 1997).

This protection reflects the goal of decreasing the chance of convicting an innocent person even at the price of increasing the chance that a guilty person may escape conviction. True, the basic purpose of a trial is to determine the truth. Neverthe­less, it is a fundamental value determination of the American criminal justice system that it is far worse to convict an innocent person than to let a guilty person go free. 1 W. LaFave & J. Israel, Criminal Procedure §1.6(c), at 45 (1984). We note that scholars have criti­

cized one of the sources defendant has cited (H. Bedau & M. Radelet, 
Miscar­riages of Justice in Poten­tially Capital Crimes
, 40 Stan. L. Rev. 21 (1987)) for the propo­si­tion that numer­ous innocent persons have been errone­ously con­victed of capital crimes. 
Herrera
, 506 U.S. at 415 n.15, 122 L. Ed. 2d at 226 n.15, 113 S. Ct. at 868 n.15, citing S. Markman & P. Cassell, Com­ment, 
Pro­tect­ing the Innocent: A Response to the Bedau–Radelet Study
, 41 Stan. L. Rev. 121 (1988).

Indeed, 
People v. Burrows
, 172 Ill. 2d 169 (1996), and 
People v. Gauger
, No. 2–94–1199 (1996) (unpublished order under Supreme Court Rule 23), referred to in the partial dissent (slip op. at 36 (Harrison, J., concurring in part and dissenting in part)), exem­pli­fy how careful the Ameri­can crimi­nal justice system is in impos­ing the death penal­ty. In 
Burrows
, the defen­dant was indicted for murder and armed robbery. His first trial resulted in a hung jury. He was retried, con­victed as charged, and sentenced to death. On direct review, this court upheld defendant's convictions and death sentence. 
People v. Burrows
, 148 Ill. 2d 196 (1992). Subsequent to defendant's retrial, his two accomplices recanted their incrimi­nating testi­mony. At the close of a hearing for post-conviction and post-judgment relief, the circuit court vacated defendant's convic­tions and death sentence and ordered a new trial. This court affirmed. 
Burrows
, 172 Ill. 2d 169 (1996). Subsequent to this court's affirmance, the charges against defendant were dropped.

In 
Gauger
, the defen­dant was convicted of two counts of murder and sentenced to death. The circuit court subse­quent­ly vacated the death penalty and sentenced defendant to two terms of natural life imprison­ment. The appellate court found that defendant's inculpatory statements were the fruits of an illegal arrest and, consequent­ly, that the trial court erred by denying defendant's motion to suppress. The appellate court reversed defendant's conviction and remanded the cause for a new trial. 
People v. Gauger
, No. 2–94–1199 (1996) (unpublished order under Supreme Court Rule 23). The prosecutor dropped the charges. In these two cases, the crimi­nal justice system, with its many procedural protections, operat­ed as it should to ensure that only truly guilty defendants are con­victed.

Since defendant's unanswerable protest is against the inherent fallibility of the Ameri­can criminal trial itself, then his posi­tion is reduced to a mere attack on the death penalty 
per se
: he feels that it is wrong and that it should not be imposed. He notes that other “inferior” criminal justice systems have abolished capital punishment. However, at least since 
Gregg
, 428 U.S. at 187, 49 L. Ed. 2d at 882-83, 96 S. Ct. at 2932, the United States Supreme Court has repeatedly rejected the contention “that the imposition of the death penalty under any circum­stances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.” 
Jurek v. Texas
, 428 U.S. 262, 268, 49 L. Ed. 2d 929, 936, 96 S. Ct. 2950, 2954 (1976). The Court has concluded:

“It is now settled that the death penalty is not in­variably cruel and unusual punishment within the mean­ing of the Eighth Amendment; it is not inherently barbaric or an unacceptable mode of punishment for crime; neither is it always disproportionate to the crime for which it is imposed.” 
Coker v. Georgia
, 433 U.S. 584, 591, 53 L. Ed. 2d 982, 989, 97 S. Ct. 2861, 2865-66 (1977) (plurality).

Thus, it is clear that defendant's personal views regard­ing the propriety of capital punishment are not reflected in eighth amendment jurisprudence.

The partial dissent attempts to shift atten­tion from the present case to past cases which do not speak to this issue. In 
People v. Kidd
, 175 Ill. 2d 1 (1996), one issue was whether the defendant was entitled to a fitness hearing because he allegedly was taking psychotropic drugs. Six members of this court were of the opinion that he was not so entitled. 
Kidd
, 175 Ill. 2d at 17-20. In 
In re Marriage of Skahan
, 178 Ill. 2d 577, this court, pursuant to its supervisory authority, ordered the appel­late court to consid­er the appeal on its merits. This court's super­vi­so­ry author­i­ty is a constitutional grant of power that is unde­fined, not limited by any specific rules, and is bounded only by the exigen­cies that call for its exercise. 
McDunn v. Wil­liams
, 156 Ill. 2d 288, 300-02 (1993).

We also note that a dissenting opinion “should be a challenge to the deci­sion or to the reasoning supporting the decision; it seeks the same objec­tive as the majority opinion–good legal doctrine correctly applied.” B. Witkin, Manual on Appel­late Court Opin­

ions §122, at 233 (1977). “A dissent should be impassive in tone rather than angry.” R. Aldisert, Opinion Writing §11.5, at 170 (1990).

One must be careful not to elevate personal beliefs above thought­ful consti­tu­tion­al analy­sis. The question of whether it is en­lightened to assess the ultimate penalty against those who commit the most heinous of crimes is simply not subject to our review. 

Judicial restraint and deference to legislative judgments are required regarding capital punishment. As judges, we may not act as we might as legislators. In a democracy, the legislature, not a court, is established to respond to the will and moral values of the people. Indeed, the selection of punishments is peculiar­ly a question of legislative policy. Therefore, in determining the constitutionality of a punishment selected by a democratical­ly elected legislature, a court presumes that the punishment is valid. A court may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. 
Gregg
, 428 U.S. at 174-76, 49 L. Ed. 2d at 875-76, 96 S. Ct. at 2925-26. This court has likewise recognized:

“that it is the legislature which has been empowered to declare and define conduct constituting a crime and to determine the nature and extent of punishment for it. [Citations.] The legislature, institutionally, is more aware than the courts of the evils confronting our society and, therefore, is more capable of gauging the seriousness of various offenses.” 
People v. Steppan
, 105 Ill. 2d 310, 319 (1985).

We note that although 12 states and the District of Columbia do not have a death penalty for any offense, 38 states and the federal government have selected the death penalty for the most abominable crimes. United States Department of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 1996 556 (1997); see D. Denno, 
Getting to Death: Are Executions Consti­tu­tion­al?
, 82 Iowa L. Rev. 319, 439-64 (1997).

The issue is not whether any justice of this court personal­ly favors or opposes capital punishment. Rather, the issue solely is whether the federal and state constitutions prohibit the legislature from mandating capital punishment for certain types of first degree murder. Clearly, the legislature is not prohibited in this regard, notwithstanding any personal views which we may have on the subject of capital punishment. See 
District Attorney v. Watson
, 381 Mass. 648, 701, 411 N.E.2d 1274, 1303 (1980) (Quirico, J., dissent­ing). This is emphatically a question for the legislature. Defendant's protest, accepted by the partial dissent, is properly addressed to the General Assem­bly and not to this court.

B. 
Meaningful Consideration of Mitigation

Defendant lastly claims that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant that precludes meaningful consideration of mitigating circumstances. This court has repeatedly rejected this argument. See, 
e.g.
, 
People v. Munson
, 171 Ill. 2d 158, 203-05 (1996); 
People v. Page
, 155 Ill. 2d 232, 283 (1993); 
Hampton
, 149 Ill. 2d at 116-17. We see no reason to reach a different result here.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Fulton County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 16, 1999, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1992). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is now confined.

Judgment affirmed
.

JUSTICE MILLER, specially concurring:

I concur in the judgment of the court, and I join the majority opinion. I write separately to add several observations about the partial dissent filed in this case.

As Justice Harrison himself once remarked, in dissent, “If the law commands a certain result, that is the result this court should reach. We do not also need to find personal fault with the parties or establish some shortcoming on the part of their attorneys in order to justify our position.” 
Zimmerman v. Buchheit of Sparta, Inc.
, 164 Ill. 2d 29, 51 (1994) (Harrison, J., dissenting). Contrary to the admonition in 
Zimmerman
, however, Justice Harrison frequently chooses, as he does in this case, to impugn the integrity of other members of the court and to impute improper motives to those with whom he disagrees. Thus, at various times, he has characterized majorities of this court as enemies of labor unions (
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 211-12 (1998) (Harrison, J., dissenting); 
American Federation of State, County & Municipal Employees v. Department of Central Management Services
, 173 Ill. 2d 299, 342 (1996) (Harrison, J., dissenting)), as foes of children (
American Federation of State, County & Municipal Employees
, 173 Ill. 2d at 337 (Harrison, J., dissenting); 
Barnett v. Zion Park District
, 171 Ill. 2d 378, 393-94 (1996) (Harrison, J., dissenting); 
Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.
, 169 Ill. 2d 110, 128 (1995) (Harrison, J., dissenting)), as biased against plaintiffs in civil actions (
Burrell v. Southern Truss
, 176 Ill. 2d 171, 178 (1997) (Harrison, J., dissenting)), and even as vigilantes (
People v. Kidd
, 175 Ill. 2d 1, 60 (1996) (Harrison, J., dissenting)).

Baseless and unfounded imputations of improper motives to those members of the court who support a majority opinion are unjustified and demean the court. Judges often disagree about what result the law requires in a particular case. The existence of these disagreements, and the ability of our legal system to thrive on them, are virtues of the judicial process and of our system of government. The terms of the debate, however, must be framed by civility and respect, and not by suspicion and untruths. When rancor eclipses reason, the quality of the debate is diminished, the bonds of collegiality are strained, and the judicial process is demeaned. We cannot prescribe civility to members of the bar when our own opinions are disfigured by comments as offensive as those we have admonished lawyers for making. See, 
e.g.
, 
Kidd
, 175 Ill. 2d at 53-54. We should receive no less from our colleagues than we expect from those who appear in our courts.

CHIEF JUSTICE FREEMAN and JUSTICE McMORROW join in this special concurrence.

JUSTICE BILANDIC, also specially concurring:

I join in the majority opinion. I also agree with the observation of the dissent that “[m]y colleagues are decent and good people.” I hasten to add that my colleagues in the majority would return that compliment.

In my view, the partial dissent by my learned colleague is a plea for abolition of the death penalty. This argument should be directed to the legislative branch, which has the power to modify or repeal a statute which it enacted.

We must not overlook the fact that in addition to safeguards provided by the judicial branch, a defendant in a capital case has the additional protection of the executive branch (Ill. Const. 1970, art. V, §12). On January 16, 1996, executive clemency was granted 
to Guinevere A. Garcia.

Prior to becoming a judge, Benjamin N. Cardozo argued against the death penalty because, “ `To me it is far from clear that weak-minded creatures would be more deterred by it than by some other form of punishment. Beyond and above all this, there is the ever-present chance of error. The risk is too great to be incurred by fallible mortals–a class large enough unfortunately to include judges, high and low.' ” A. Kaufman, Cardozo 395 (1998) (quoting Benjamin N. Cardozo). However, when he became a judge and had responsibility, “[h]e applied New York's death penalty statutes and voted to affirm numerous death sentences.” A. Kaufman, Cardozo 396 (1998).

The dissent eloquently expresses a personal conviction but does not address the sound and authoritative opinion of the majority.

JUSTICE NICKELS joins in this special concurrence.

JUSTICE HEIPLE, also specially concurring:

I take issue with but one portion of the majority opinion. The majority holds that in interpreting the search and seizure provision in the Illinois Constitution (Ill. Const. 1970, art. I, §6), this court “looks to the United States Supreme Court's interpretation of the fourth amendment” to the United States Constitution. Slip op. at 10. In light of this court's recent opinion in 
People v. Krueger
, 175 Ill. 2d 60 (1996), I believe this statement to be both unfortunate and incorrect.

In 
Krueger
, we noted that this court “has the authority to interpret provisions of our state constitution more broadly than the United States Supreme Court interprets similar provisions of the federal constitution.” 
Krueger
, 175 Ill. 2d at 74. We then proceeded to analyze whether the search and seizure provision of the Illinois Constitution is subject to an exception for illegal searches conducted by law enforcement authorities in “good faith.” Concluding that such an exception would fail to adequately protect the right of Illinois citizens to be free from unreasonable governmental intrusion, we explicitly rejected, as a matter of state constitutional law, the United States Supreme Court's adoption of a good-faith exception to the federal constitution. 
Krueger
, 175 Ill. 2d at 75. Our decision in 
Krueger
 thus firmly establishes the principle that article I, section 6, of the Illinois Constitution is to be interpreted in a manner independent of United States Supreme Court jurisprudence.

Nevertheless, because I believe the search conducted in the instant case violated neither the United States Constitution nor the Illinois Constitution, I concur in the court's judgment.

JUSTICE HARRISON, concurring in part and dissenting in part:

My colleagues turn aside defendant's constitutional challenge with the observation that the American criminal justice system is one of the best in the world. The sentiment has a pleasant and reassuring tone, but it overlooks an important fact. The supposedly “inferior” justice systems of other nations are abandoning capital punishment at an unprecedented rate. Hood, 
The Death Penalty: The USA in World Perspective
, 6 J. Transnat'l L. & Pol'y 517, 519 (1997). With the exception of Japan, the United States is now the only well-established democracy that has not abolished the death penalty expressly or in practice. Wyman, 
Vengeance is Whose?: The Death Penalty and Cultural Relativism in International Law
, 6 J. Transnat'l L. & Pol'y 543, 544 (1997). Western Europe is free of capital punishment (6 J. Transnat'l L. & Pol'y at 525), as are most countries in our hemisphere (6 J. Transnat'l L. & Pol'y at 570). Even in the United States, 12 states and the District of Columbia presently have no death penalty for any offense, no matter how severe. A. Phillips, 
Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing
, 35 Am. Crim. L. Rev. 93, 99 n.54 (1997).

I do not know enough about international law to judge whether the nations who have abolished capital punishment are, in fact, less protective of individual human rights than the courts in the United States. I do know, however, that the abolitionist nations have at least insured that no one will pay the ultimate price for their fallibility. That is decidedly not the case in those United States jurisdictions retaining the death penalty, including Illinois.

Despite the courts' efforts to fashion a death penalty scheme that is just, fair, and reliable, the system is not working. Innocent people are being sentenced to death. Examples of innocent people who were arrested, tried and convicted of capital offenses are numerous and well documented. See Staff of House Subcomm. on Civil & Constitutional Rights, Committee on the Judiciary, 103d Cong., 2d Sess., Innocence and the Death Penalty: Assessing the Danger of Mistaken Executions (1994); H. Bedau & M. Radelet, 
Miscarriages of Justice in Potentially Capital Cases
, 40 Stan. L. Rev. 21 (1987).

 In Illinois, the best-known case of an individual wrongfully convicted of capital murder and sentenced to death is that of Rolando Cruz, who was actually convicted and given the death sentence twice before being found innocent in 1995. Cruz's codefendant, Alejandro Hernandez, had the charges against him dropped after being convicted of capital murder twice and having the death sentence imposed once. In 1996, Verneal Jimerson and Dennis Williams were exonerated after being convicted and sentenced to death for the 1978 murders of Larry Lionberg and Carol Schmal. The same year, Gary Gauger, who had been placed on Death Row for the murder of his parents, was set free after his conviction was reversed based on, 
inter alia
, insufficient evidence. Also in 1996, Carl Lawson was acquitted on his second retrial after having been sentenced to death for the murder of an eight-

year-old child. In 1994, Joseph Burrows was released after spending five years on Death Row for the murder of William Dulin, a crime he did not commit. Finally, in 1987, Perry Cobb and Darby Williams (Tillis) were eventually acquitted after having previously been convicted and sentenced to death for the 1977 double murder of Melvin Kanter and Charles Guccion.

Some would suggest that the freedom now enjoyed by these nine men demonstrates that our criminal justice system is working effectively with adequate safeguards. If there had been only one or two wrongful death penalty cases, I might be persuaded to accept that view. When there have been so many mistakes in such a short span of time, however, the only conclusion I can draw is that the system does not work as the Constitution requires it to.

If these men dodged the executioner, it was only because of luck and the dedication of the attorneys, reporters, family members and volunteers who labored to win their release. They survived despite the criminal justice system, not because of it. The truth is that left to the devices of the court system, they would probably have all ended up dead at the hands of the state for crimes they did not commit. One must wonder how many others have not been so fortunate.

The prognosis for wrongly accused defendants facing capital charges is not improving. To the contrary, legislatures and the courts appear to have abandoned any genuine concern with insuring the fairness and reliability of the system. Achieving “finality” in death cases, and doing so as expeditiously as possible, have become the dominant goals in death penalty jurisprudence. 

Not so long ago, the federal courts provided meaningful oversight to the way in which state courts exercised their authority to put people to death. That oversight has all but disappeared. 
Callins v. Collins
, 510 U.S. 1141, 1158-59, 127 L. Ed. 2d 435, 448-49, 114 S. Ct. 1127, 1138 (1994) (Blackmun, J., dissenting). For all practical purposes, the states have been left to their own devices. Based on recent experience in Illinois, the consequences are apt to be grave. 

The General Assembly has drastically shortened the period in which post-conviction relief can be sought, thereby reducing the time in which exonerating evidence may be discovered. See 725 ILCS 5/122–1 (West 1996). The number of death cases is rising, the pace of executions is quickening, and our court, which is responsible for reviewing all cases in which the death penalty is imposed, has demonstrated an unfortunate willingness to disregard the law in order to affirm a sentence of death. See 
People v. Kidd
, 175 Ill. 2d 1, 59-60 (1996) (Harrison, J., dissenting). I note, moreover, that it apparently no longer feels constrained to follow its own rules of court, even when they are jurisdictional and mandatory (see 
In re Marriage of Skahan
, 178 Ill. 2d 577 (1998) (Harrison, J., dissenting)).

The result, inevitably, will be that innocent persons are going to be sentenced to death and be executed in Illinois. A sentencing scheme which permits such horrific and irrevocable results cannot meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2).

It is no answer to say that we are doing the best we can. If this is the best our state can do, we have no business sending people to their deaths. As outraged as we may feel personally over the terrible acts committed by the defendant in this case, that is no justification for perpetuating a system that violates our most basic constitutional principles. 

Before any of us gets too righteous about what a despicable character defendant is, we should also stop for a moment and reflect on how easy it was to condemn an individual such as Rolando Cruz, who was ultimately determined to be innocent. This is not to suggest that the defendant in this case was not actually guilty either. My point is simply that when a system is as prone to error as our is, we should not be making irrevocable decisions about any human life.

My colleagues are decent and good people. Just as the execution of an innocent person is inevitable, it is inevitable that one day the majority will no longer be able to deny that the Illinois death penalty scheme, as presently administered, is profoundly unjust. When that day comes, as it must, my colleagues will see what they have allowed to happen, and they will feel ashamed.

Donald Bull's conviction should be affirmed, but his sentence of death should be vacated, and the cause should be remanded to the circuit court for imposition of a sentence other than death.